CHARLES W. AND MARY H. MILLER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT
SOUTHERN DIRECTORY CO., INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3870–68, 3871–68. Filed June 29, 1971.

Charles W. Miller, pro se.
*Harvey S. Jackson*, for the respondent.

IRWIN, *Judge:* Respondent determined deficiencies in petitioners' income tax for the following years:

| Petitioner | Year | Deficiency |
|---|---|---|
| Charles W. and Mary H. Miller | 1964 | $4,865.68 |
|  | 1965 | 4,484.26 |
|  | 1966 | 13,920.89 |
| Southern Directory Co., Inc | 1965 | 6,199.59 |
|  | 1966 | 2,542.96 |

Certain concessions having been made by the parties, the only issues remaining for decision are:

(1) Whether amounts received by petitioners Charles W. and Mary H. Miller during the years 1964, 1965, and 1966 were taxable as ordinary income, as opposed to capital gain from the sale of goodwill; and

(2) Whether petitioner Southern Directory Co., Inc., experienced a section 1231 loss in the amount of $110,000 during the year 1965. If we decide this last question in the affirmative, then we must also decide whether petitioner Southern Directory Co., Inc., was entitled to a net operating loss carryover and a section 172 [1] deduction in the year 1966.

---

[1] All statutory references in this case are to the Internal Revenue Code of 1954, as amended.

### FINDINGS OF FACT

Some of the facts have been stipulated by the parties. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Petitioners Charles W. Miller (Charles) and Mary H. Miller are husband and wife and were residents of Asheville, N.C., at the time their petition herein was filed. Petitioners filed joint returns for each of the years in issue with the district director of internal revenue, Greensboro, N.C. Because Mary H. Miller is a party to this case only by virtue of having joined with her husband in filing their Federal income tax returns for the years under consideration, reference will be made only to Charles wherever events concerning the individual petitioners in this case are discussed.

Petitioner Southern Directory Co., Inc., is a corporation organized and existing under laws of the State of North Carolina, and having its principal office in the City of Asheville, N.C. For the years in issue, it filed U.S. corporation income tax returns with the district director of internal revenue, Greensboro, N.C.

For many years prior to 1959, Charles operated, as an individual proprietorship, a city directory publishing business called the Southern Directory Co. (Directory). Begun in just one community, Charles built up the business to the point where it published directories for approximately 40 cities in several Southern States. On November 25, 1953, a portion of this business, comprising nine communities, was sold to R. L. Polk & Co. (Polk) of Detroit, Mich. The amount paid to Charles under this agreement aggregated $47,400. The manner in which this figure was arrived at (as well as the attendant obligations imposed upon Charles) is illustrated by the following excerpts from the November 25 agreement:

### WITNESSETH:

WHEREAS, Miller is the owner and publisher of city directories for the cities of Fort Lauderdale, Hollywood, Delray and Gainesville in the State of Florida, Albany, Thomasville and Waycross in the State of Georgia, and Fredericksburg and Martinsville in the State of Virginia, which he desires to sell to the said Polk; Now, THEREFORE,

IT IS AGREED BY AND BETWEEN THE SAID PARTIES AS FOLLOWS:

(1) MILLER DOES HEREBY sell, assign, transfer and set over unto Polk the assets hereinafter enumerated *and all goodwill* of and pertaining to the publishing of a city directory for each of the communities above named for the sum of One Thousand Dollars ($1,000.00) *and the further sums hereinafter provided* to be paid to the said Miller by Polk. [Emphasis supplied.]

(2) IN ADDITION TO the One Thousand Dollars ($1,000.00) above mentioned Polk shall pay to Miller for each of the publications the following amounts:

| | |
|---|---|
| Fort Lauderdale, Fla | $14,000 |
| Delray Beach, Fla | 3,200 |

| | |
|---|---|
| Gainesville, Fla. | $5,400 |
| Hollywood, Fla. | 6,400 |
| Albany, Ga. | 6,000 |
| Thomasville, Ga. | 2,400 |
| Waycross, Ga. | 3,200 |
| Fredericksburg, Va. | 2,400 |
| Martinsville, Va. | 3,400 |

which amounts the said Miller represents to be approximately fifty per cent (50%) of the total sales made by him upon the last edition of each of said books within the State of Florida and forty percent (40%) of such total sales on each of the other books: IT BEING UNDERSTOOD AND AGREED that each of said books shall constitute a separate and distinct transaction. It is agreed that Polk shall have the privilege of examining and auditing the sales records and accounts of said Miller on the above books if it shall so desire, and in the event such examination discloses that such amounts do not approximate such percentage of sales within two per cent (2%) the price shall be adjusted accordingly.

\* \* \* \* \* \* \*

(5) MILLER SHALL IMMEDIATELY DELIVER to Polk a copy of his patronage list, all information, data, enumeration lists and other records of any nature whatsoever pertaining to the publication of each such directory, excepting only his books of account, which shall or may in any way be of assistance to Polk in the publication of subsequent issues of such directories. *Miller shall also turn over to Polk any directory libraries now maintained in any of such communities, and also such copies of the last edition of each of said directories as may be needed by Polk* in its preparation of its first edition of any such directory as shall be in the possession of said Miller. [Emphasis supplied.]

\* \* \* \* · \* \* \*

(7) AS PART OF THE CONSIDERATION for this agreement, Miller specifically agrees that except as to collections for past sales, he will not directly or indirectly for a period of ten (10) years from and after the final payment of the purchase price herein set out, engage in the publication of any directory of any nature whatsoever for any of the communities which Polk purchases under this agreement; nor will he, in any manner, become involved with any other person or firm, financially or otherwise, in competition with Polk in any such publication, but that he will endeavor to the best of his ability, insofar as he can consistently do so, to protect and advance the interest of Polk as publisher of each such directory.

On May 9, 1959, Charles and a former employee named John E. Cooke (Cooke) entered into an agreement to form a city directory publishing corporation to be called the Southern Directory Co., Inc. (Southern). Pertinent excerpts from this agreement are as follows:

WHEREAS, the Organizers propose that such Corporation shall have an authorized capital stock of Ten Thousand Dollars consisting of one thousand shares of common stock and that the said John Elliott Cooke will have the privilege of subscribing to 49% of the above issued stock and that Charles W. Miller will have the privilege of subscribing to the other 51% of the above issued stock. The said John Elliott Cooke will have the privilege of paying for his stock subscription by notes payable five (5) years from date.

*It is further agreed that the said Charles W. Miller T/R Southern Directory Co., will sell to the organized corporation all title and interest to the City Directories that he now publishes at a cost basis of fifty (50)% of the previous year*

*patronage.* These payments will be payable within a period of ten years from net earnings of the organized corporation. [Emphasis supplied.]

It is also agreed that the said John Elliott Cooke will begin employment with Charles W. Miller T/A Southern Directory Co. on May 11, 1959 as salesman-ager, with a salary not less than $150.00 per week and that when the organized corporation is organized no employee or officer will receive salary larger than that paid to John Elliott Cooke.

Pursuant to the above agreement, Southern was incorporated under the laws of the State of North Carolina. Southern's original sharehold-ers were as follows:

| Shareholders | Shares issued (at $50 par value) | Date issued | Initial capital |
|---|---|---|---|
| Charles W. Miller | 70 | 12/12/59 | $3,500 |
| Mary H. Miller | 2 | 12/12/59 | 100 |
| John E. Cooke | 6 | 1/9/61 | 300 |
| | 78 | | 3,900 |

In accordance with the terms of the May 9, 1959, incorporation agreement, on November 15, 1959, Charles and Southern entered into a contract for the sale of Charles' interest in the city directory pub-lishing business (Directory) which he had been conducting as an individual proprietorship. Those provisions of the November 15 agree-ment which are pertinent to this discussion are set out as follows:

WITNESSETH:

WHEREAS, Miller is the owner and publisher of city directories for cities in North Carolina, Georgia, Florida, Virginia and Tennessee, which he desires to sell to the said SOUTHERN DIRECTORY CO.; Now, THEREFORE, IT IS AGREED BY AND BETWEEN THE SAID PARTIES AS FOLLOWS:

(1.) MILLER DOES HEREBY sell, assign, and set over unto the SOUTHERN DIRECTORY CO. *the assets hereinafter enumerated and all goodwill* of and per-taining to the publishing of a city directory for each of the communities, now published by Miller, *for the sum of Fifteen Hundred Dollars ($1,500.00) and the further sums hereinafter provided* to be paid to the said Miller by SOUTHERN DIRECTORY CO. [Emphasis supplied.]

(2.) IN ADDITION TO the Fifteen Hundred Dollars ($1,500.00) above mentioned, SOUTHERN DIRECTORY CO. shall pay to Miller for all of his publications the following amounts:

Fifteen Hundred Dollars ($1,500.00) on January 1, 1960.

*One Hundred and Ten Thousand Dollars* ($110,000.00) *which amounts the said Miller represents to be approximately fifty percent (50%) of the total sales made by him upon the last edition of each of his publications.* It is agreed that SOUTHERN DIRECTORY CO. shall have the privilege of examining and audit-ing the sales records and accounts of said Miller on his publications if it shall so desire. [Emphasis supplied.]

ALL PAYMENTS which are not paid on due date shall bear interest at the rate of six percent (6%) per annum.

(3.) PAYMENT SHALL BE MADE in the following manner:

Fifteen Hundred Dollars ($1,500.00) upon the execution and delivery of this agreement receipt of which is hereby acknowledged.

Fifteen Hundred Dollars ($1,500.00) on January 1, 1960.

THERE SHALL BE DUE and payable from SOUTHERN DIRECTORY CO. to Miller the sum of One Hundred and Ten Thousand Dollars ($110,000.00) to be paid in ten annual installments of Eleven Thousand Dollars ($11,000.00) each and the first payment will be due and payable January 1, 1961 and the same amount due and payable on each January 1st thereafter until ten payments of Eleven Thousand Dollars ($11,000.00) each have been completed.

(4) MILLER SHALL IMMEDIATELY DELIVER to SOUTHERN DIRECTORY CO. a copy of his patronage list, all information, data, enumeration lists and other records of any nature whatsoever [2] pertaining to the publication of his city directories, which shall or may not be of assistance to SOUTHERN DIRECTORY CO. in the publication of subsequent issues of such directories.

(5.) AS PART OF THE CONSIDERATION for this agreement, Miller specifically agrees that except as to collections for past sales, he *will not directly or indirectly for a period of ten (10) years from and after the payment of the purchase price herein set out, engage in the publication of any directory of any nature whatsoever for any of the communities which Southern Directory Co. purchases under this agreement;* nor will he, in any manner, become involved with any other person or firm, financially or otherwise, in competition with Southern Directory Co. in any such publication. [Emphasis supplied.]

Of the amounts due Charles pursuant to the above agreement, the $1,500 paid to him during each of the years 1959 and 1960 came from the original stock purchases referred to earlier. The remaining $110,000 was paid to Charles under an accelerated scale pursuant to which Charles received all amounts due him by the end of 1966. No evidence was offered as to why payment of the $110,000 was paid during this shortened period of time, as opposed to the agreed upon 10-year payout period. Under this accelerated arrangement, Charles received from Southern respective payments of $11,000, $11,000, and $30,000 during the respective years 1964, 1965, and 1966 (at issue herein). These amounts were reported as capital gains on Charles' Federal income tax return for the years 1964, 1965, and 1966, respectively. However, in his notice of deficiency respondent treated such amounts as ordinary income.[3]

---

[2] It is not clear whether the phrase "and any other records of any nature whatsoever" contemplated the conveyance of (a) the various directory libraries which were maintained in many of the communities serviced by Directory, or (b) copies of the latest directory edition for each of these communities. However, given the broad scope of the language employed in par. 4, we believe the parties intended that both the directory libraries and copies of the latest directory editions would be conveyed to Southern along with the other assets outlined in that paragraph. (The term "directory library" refers to a collection of directories taken from more than one city. Directory libraries maintained in a given city would usually contain directories for neighboring communities.)

[3] Respondent also denied certain deductions aggregating $2,142.05 for the years 1964, 1965, and 1966 which Charles had treated as deductible business travel expenditures on his returns for these years. During the trial, Charles conceded that all but $200 of these amounts were properly disallowed. However, no proof was offered with respect to the $200 residue, and no mention of this amount was made on brief. Accordingly, since petitioner bears the burden of proof with regard to this matter, we interpret petitioner's inaction as being equivalent to a concession, and hold for respondent on the full $2,142.05 claimed as business travel expenses during the years 1964 through 1966.

During the early part of 1960, negotiations were entered into between Charles, Southern, and one P. C. Atha, Jr. (Atha), for the sale of 225 shares of Southern stock at a price exceeding $110,000. Although an option agreement for the purchase of such shares was drafted on April 4, 1960, negotiations broke down when Atha was unable to raise the necessary downpayment, and the sale of stock was never consummated.

On or about April 7, 1962, Cooke voluntarily, and without formal notice or explanation, left Southern's employ. Thereafter Southern was presided over by Charles, as president-treasurer, and by Mary, as secretary. The office of vice president, formerly occupied by Cooke, was thereafter vacant. With the departure of Cooke, Southern was operated as a "one man business" with Charles being the "one man."

For whatever the reason, Southern did not annually publish a new directory in each community it serviced. Most of the directories it published were released every second or third year. As a result, there always existed the chance that a competing publisher might come in during an off year and spirit away all of the directory business formerly enjoyed by Southern. Moreover, since the publication of a city directory usually required the approval of the local chamber of commerce, a hiatus in publication of a year or two created the risk that there would be a change in the composition of a given community's chamber members, and that the new body might favor a new directory publisher. Accordingly, by not publishing every year in every city, Southern always risked the chance of not being around when it came time to greet new, and possibly influential, members of a given community's chamber of commerce. However, the impact of this "fact of life" on either Directory's or Southern's publishing activities is, at best, unclear. Indeed, of the city directories sold to Southern in November 1969, none had been published since 1955 in the case of two communities, and since 1957 in the case of eight other communities; yet, each of these cities remained with Southern until 1965—the year in which Southern terminated its publishing activities with respect to these and other cities.

On or about May 10, 1965, a summons containing an order to show cause why Southern, and others, should not be found in civil and criminal contempt of an order of the U.S. District Court for the Eastern District of Michigan, was served on Southern at its offices in Asheville, N.C. Southern had no knowledge of this "show cause" order prior to its receipt. The events which underlie the above are summarized in the petition which was filed by the Department of Justice, requesting the "show cause" order. Pertinent excerpts from the Justice Department's petition appear as follows:

IN THE UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION

\*    \*    \*    \*    \*    \*    \*

PETITION BY THE UNITED STATES FOR AN ORDER TO SHOW CAUSE WHY THE RESPONDENTS SHOULD NOT BE FOUND IN CRIMINAL AND CIVIL CONTEMPT.

The United States of America, petitioner, by its attorneys, acting under the direction of the Attorney General, presents this Petition for an order requiring the above-named respondents [one of whom was the Southern Directory Co., Inc.] to show cause why they should not be found in criminal and civil contempt of this Court. The petitioner represents to the Court as follows:

I

DESCRIPTION OF RESPONDENTS

\*    \*    \*    \*    \*    \*    \*

Respondent Southern Directory Co. (Inc.), hereinafter sometimes referred to as Southern, is a corporation organized and existing under the laws of the State of North Carolina, with its principal place of business in Asheville, North Carolina. Southern is a member of respondent Association.

\*    \*    \*    \*    \*    \*    \*

With knowledge of the provisions of the Final Judgment in Civil Action #13135, respondent Southern acted in concert with respondent Polk in disobedience to certain terms of said Final Judgment.

\*    \*    \*    \*    \*    \*    \*

II

PRIOR JUDGMENT OF THIS COURT

On January 8, 1954, petitioner filed with this Court Civil Action #13135, brought under Section 4 of the Sherman Act charging that for many years past, and continuing up to the date of the complaint, the defendants had been engaged in an unlawful combination and conspiracy in restraint of, and had attempted to monopolize and had monopolized, the trade and commerce in the sale of city directories among the several states of the United States, in violation of Sections 1 & 2 of the Sherman Act. Respondents Polk (in which respondent Gardner was then an executive officer) and the Association were defendants in that action.

On March 16, 1955, there was entered in this Court upon consent of the parties in Civil Action #13135, a Final Judgment, hereinafter referred to as the "Judgment." A copy of this judgment is annexed to this petition and marked "Exhibit A."

Section X of said Judgment provides as follows:

"Jurisdiction is retained for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, or for the modification of any provisions thereof, for the enforcement or compliance therewith or for the punishment of violations thereof."

III

ALLEGED VIOLATIONS OF THE JUDGMENT

\*    \*    \*    \*    \*    \*    \*

B. Violations of Section VI(A) of the Judgment:

Section VI(A) of the Judgment reads as follows:

"The corporate defendants are jointly and severally enjoined and restrained from, directly or indirectly, entering into, adhering to, maintaining or claiming any rights under, any contract, agreement, understanding, plan or program with any defendant or with any other publisher, or with any central agency of or for publishers to:

"(1) designate, or allocate any city, territory or market of any publisher for the publication, sale or distribution of city directories;

"(2) hinder, restrict, limit or prevent any publisher from publishing a city directory or from soliciting or obtaining the sponsorship of any Chamber of Commerce, Board of Trade or other similar civic or trade organization in connection with the publication, sale or distribution of city directories;

"(3) refrain from competing or to leave any publisher free from competition in the publication, sale or distribution of city directories in any city, territory or market, except under a reasonable covenant not to compete contained in a directory business sale-and-purchase agreement not otherwise prohibited by this Final Judgment; * * *"

\*　　\*　　\*　　\*　　\*　　\*　　\*

Petitioner charges that the respondents, since at least January 1, 1960, to the date of filing of this petition, have knowingly disobeyed and violated Section VI (a) of the Judgment, as follows:

1. Polk and Southern entered into an agreement, understanding, plan or program to leave Southern free from competition, to allocate markets to Southern and to hinder, restrict and limit competition of publishers other than Southern in Moultrie, Jesup and Cordele, Georgia; Hickory, Siler City, Reidsville, Shelby and Greenville, N.C.; and Farmville, Virginia, and other markets where Southern engaged in business;

\*　　\*　　\*　　\*　　\*　　\*　　\*

7. Polk and Southern entered into an agreement, understanding, plan or program to leave Polk free from competition and to allocate markets to Polk in Ft. Lauderdale, Delray Beach, Gainsville and Hollywood, Florida; Albany, Thomasville and Waycross, Georgia; and Fredericksburg and Martinsville, Virginia; and other markets in which Polk engaged in business.

\*　　\*　　\*　　\*　　\*　　\*　　\*

WHEREFORE, the petitioner moves this Court to:

(a) issue an order directing each of the foregoing respondents to appear before this Court at a time and place to be fixed in said Order to Show Cause why they should not be adjudged in criminal contempt and civil contempt of this Court and punished therefor; and further

(b) to issue such further orders as the nature of the case may require and as the Court may deem just and proper to compel obedience to, and compliance with the Final Judgment.

The order to show cause which issued from the District Court in response to the above petition contained the following pertinent language:

### ORDER TO SHOW CAUSE

On petition of the United States of America, and good cause being shown by the Petition and the Affidavit in Support thereof, filed by attorneys acting under direction of the Attorney General, charging criminal and civil contempt of this Court by the respondents;

IT IS ORDERED that * * * [respondents named] show cause in the United States District Court, Detroit, Michigan, on the 10th day of May at 10:00 a.m., 1965, why each of them should not be adjudged to be in contempt of this Court for

having violated the provisions of subsections V(D), VI(A) and VII of the Final Judgment entered by this Court on March 16, 1955, in Civil Action No. 13135, entitled *United States of America* v. *R. L. Polk & Company, et al.,* and punished for the same; and why respondents * * * Southern Directory Co. (Inc.) * * * should not be adjudged to be in contempt of this Court for having violated the provisions of Subsection VI(A) of the aforesaid Final Judgment, and punished for the same.

On November 8, 1968, the Government's suit against Southern was dismissed, and all outstanding charges arising from the above order were dismissed.

Shortly after Southern received the "show cause" order described above, it received a letter from a Detroit, Mich., attorney named William E. Speer (Speer). In this letter, dated June 8, 1965, Speer discussed certain aspects of the Government's suit against Southern, and also informed Charles that a certain company (Polk) which had been interested in purchasing Southern's publishing business would not be interested in continuing negotiations until Southern's difficulties with the Government were resolved:

On August 21, 1965, Southern entered into an agreement of purchase and sale with the Mullin-Kille Co. of Ohio (Mullin). Pursuant to this agreement, Southern, for a consideration of $1,000, agreed to sell to Mullin—

all of the files, subscription information, advertising materials and data, correspondence, and books and records (all of which files, subscription information, etc. are hereinafter collectively referred to as "files and records") of Southern relating to the production by Southern since January 1, 1960, of city directories in each of the forty communities (hereinafter called the "communities") listed in Exhibit A * * *

and to deliver to Mullin—

two copies of the most recent edition of its city directory for such community and as many copies of back issues as Mullin-Kille shall reasonably request and as Southern has available. Within 60 days thereafter Southern shall deliver to Mullin-Kille six additional copies of the most recent edition of its city directory for such community. * * *

Other pertinent features of this agreement appear as follows:

[1] Southern hereby relinquishes any proprietary interest it may have in the libraries of city directories which it has previously furnished to any organization or individual in any of the communities, and agrees that they may remain in their present locations (i.e., banks, chamber of commerce offices, etc.) in each of the said communities.

[2] For a period of ten years after the execution of this agreement, Mullin-Kille shall not sell, assign, or otherwise transfer ownership of any of the files and records delivered by Southern to Mullin-Kille hereunder without the written consent of Southern.

[3] If at any time during a period of ten years after the execution of this agreement, Charles W. Miller, the principal shareholder and executive officer of Southern, in the manner provided for therein, terminates *his duties under a*

*Consulting and Noncompetition Agreement entered into this date between him and Mullin-Kille,* then Mullin-Kille shall deliver to Southern all or any portion requested by Southern of the files and records delivered to it by Southern hereunder [4] [Emphasis supplied.]

At no point in the agreement was there any reference to the 10-year convenant not to compete which Charles had executed in favor of Southern as part of the November 15, 1959, agreement for the sale to Southern of Charles' publishing business.

Concurrent with the above, Charles, acting in his individual capacity, entered into a second agreement with Mullin. The terms of this second agreement, which was captioned "Consulting and Noncompetition Agreement" are set out, in pertinent part, as follows:

This is a Consulting and Noncompetition Agreement entered into August 21, 1965, by and between MULLIN-KILLE COMPANY OF OHIO, an Ohio corporation, hereinafter called "Mullin-Kille," and CHARLES W. MILLER, of Asheville, North Carolina, hereinafter called "Miller."

#### Background Information

A. For many years, Miller has been engaged in and has been familiar with the publication of city directories in the communities (hereinafter called the "Communities") listed in Exhibit A, * * * [which list was in all respects identical to the list contained in Exhibit A of the Mullin-Southern agreement]. He has had experience concerning, and is familiar with,. the problems and potential of the city directory business in the aforesaid Communities.

B. Mullin-Kille desires to regularly publish city directories for each of the Communities, desires to utilize the knowledge, assistance and experience of Miller with respect to them, and further desires that Miller not compete with it.

#### Statement of Agreement

In consideration of the mutual covenants hereinafter set forth, the parties hereby agree as follows:

1. *Representations of Miller.*—Miller hereby represents and warrants that he has actively participated in the production of a city directory in all or substantially all of the forty Communities within the past four years; that he is acquainted with and has a working knowledge of persons and institutions in each Community which will be a substantal aid in the production of a city directory in each of said Communities; that his reputation for honest and reliable business dealings is established in each of said Communities; and that no competitive city directory (other than the directory with which he was associated) has been published in any of the Communities within the past five years with the exception of the following communities: Marion, Pulaski, Radford, and Wytheville, Virginia; and Valdese, Marion, Kings Mountain, and Elizabeth City, North Carolina.

---

4 Also on Aug. 21, 1965, Mullin entered into an agreement with Miller whereby Mullin agreed to pay Miller $2,000 for services rendered with respect to a directory for the city of Lexington, N.C. Though the terms of the agreement indicate that Miller was acting in his individual capacity, the parties seem to be in agreement that the $2,000 was paid to Southern, presumably through Miller as agent for Southern. In any event, respondent acknowledges that the total selling price for the assets sold by Southern to Mullin was $3,000 as opposed to $1,000.

2. *Covenant Not to Compete.*—Miller shall not work for, assist, advise, consult with or in any capacity serve, nor himself become, a competitor of Mullin-Kille during the term of this agreement. During such period, Miller shall refrain from engaging, or in any manner participating in, the management, operation, or ownership of any business which is competitive with the city directory business conducted by Mullin-Kille. Miller shall not, directly or indirectly, alone or as a member of a partnership, or as an officer, director, or stockholder of any corporation, be engaged in or concerned with any commercial duties or pursuits whatsoever in the states of North Carolina, Virginia or Georgia, in connection with any business which competes with the city directory business conducted by Mullin-Kille.

3. *Duties of Miller.*—Mullin-Kille hereby engages Miller for consultation, advice, and assistance with respect to the publication of city directories in each of the Communities for a period of 10 years from the date of this agreement, and Miller hereby agrees to perform all such consultation and assistance as Mullin-Kille shall reasonably request him to perform during such period. During the publication of its first editions of city directories in the Communities, Miller shall make telephone calls to various organizations and individuals in the Communities on behalf of Mullin-Kille, prepare letters of introduction for employees of Mullin-Kille to various banks, Chambers of Commerce, and other organizations and individuals in the Communities as designated by Mullin-Kille, and perform such other specific services in connection with the introduction, establishment, and maintenance of Mullin-Kille as a reputable, reliable and efficient publisher of city directories in the Communities as Mullin-Kille shall reasonably request from time to time. After Mullin-Kille's publication of the first edition of a city directory for a Community, Miller shall render advice and consult with Mullin-Kille as reasonably requested, * * *

4. *Payments to Miller.*—In consideration for the agreements and undertakings of Miller contained herein, Mullin-Kille agrees to pay Miller at the rate of Eight Hundred Thirty-five Dollars ($835.00) per month, payable on or before the 10th day of each month for a period of 119 months, commencing on the 10th day of September, 1965.

5. *Failure of Performance.*—If Miller shall, otherwise than on account of physical disability or mental incapacity or death, cease to furnish such services as may, from time to time, be requested by Mullin-Kille as provided herein, or cease to hold himself available for the furnishing of such services, or violate the provisions of paragraph 2, above, or any of the other terms or conditions of this agreement, he shall forfeit all rights to future payments of any kind under this contract.

If at any time any payment due from Mullin-Kille to Miller remains unpaid for a period of six months after its due date, Miller may give notice to Mullin-Kille in writing of his intention to either (a) elect to terminate, without liability for breach, this agreement and the rights and duties of both parties hereunder, or (b) to bring legal action and recover damages for breach of this agreement. * * *

6. *Miller is Independent Consultant.*—In the performance of his consultative and advisory duties hereunder, Miller's relation to Mullin-Kille shall be that of an independent consultant. He shall be free to devote such portions of his entire time, energy, and skill as he is not obligated to devote hereunder to Mullin-Kille in such manner as he sees fit * * * subject to the provisions of paragraph 2, above.

As a result of the "show cause" order which it had received on May 10, 1965, Southern viewed its transaction with Mullin as a "distress

sale" brought on by the "threat or imminent destruction" of its business. Accordingly, on its return for the year 1965, Southern (apparently relying on sections 1033 and 1231) treated the difference between its alleged basis of $113,000 and the $3,000 received from Mullin as a deductible loss in the amount of $110,000. The resultant net operating loss was then carried over to 1966 as a section 172 deduction in the amount of $24,041.60. Respondent denied both the 1965 deduction arising from the section 1231 loss, and the 1966 deduction arising from the section 172 net operating loss carryover.

OPINION

*Issue 1. Whether the Amounts Received by Charles as a Result of the November 15, 1959, Sale to Southern Constituted Capital Gains or Ordinary income* [5]

During the years 1932 through the beginning of 1959 petitioner operated a city directory company called the Southern Directory Co. (Directory). In May 1959, petitioner and a former employee (Cooke) entered into an agreement whereby it was agreed that a corporation would be formed to take over the directory business theretofore owned by petitioner, and that Cooke would be entitled to subscribe to 49 percent of the stock of the new corporation which was to be called the Southern Directory Co. Inc. (Southern). Also as part of this agreement, it was agreed that petitioner would sell Southern all of his interest in the directories which were being published by Directory. The price which Southern was to pay petitioner for these directories totaled $113,000, $110,000 of which was to be paid out over a 10-year period. The $113,000 sales price was designed to equal about one-half of the income received from the sale of the most recent edition of these directories.

The sale to Southern took place on November 15, 1959. Paragraph 1 of the agreement of sale provided, *inter alia*, for the sale of goodwill in an unspecified amount. Paragraph 5 of the agreement contained a covenant executed by petitioner under which he promised not to compete with Southern for a period of 10 years. Our task is to determine which part, if any, of the price paid to petitioner was in consideration of the sale of goodwill mentioned in paragraph 1 of the November 15 agreement.

We begin our analysis with the now readily accepted proposition that, while subject to careful scrutiny, *William C. Baird*, 25 T.C. 387, 393 (1955), an agreement between a corporation and its primary shareholder is valid and enforceable, providing it is fair, reasonable, and

---

[5] To facilitate the presentation of the within proceeding, the term "petitioner" will be used in issue 1 only with respect to petitioner Charles W. Miller, and in issue 2 only with respect to petitioner Southern Directory Co., Inc.

conducted at arm's length. *United States Mineral Products Co.*, 52 T.C. 177, 192 (1969). In the instant case, we believe that the agreement between Charles and Southern was (a) fair and reasonable, as evidenced by the November 1953 sale in which petitioner and Polk employed a similar formula in arriving at a sales price for certain of petitioner's directories which were then being sold; and (b) conducted at arm's length, as evidenced by the price which Atha was willing to pay for Southern stock only a few months after the directory sale between Southern and petitioner. However, if we are to uphold petitioner's contention that any, let alone all, of the proceeds received from Southern as a result of the November 15, 1959, agreement of sale must be treated as gain from the sale of a capital asset in the nature of goodwill, more must be shown than the fact that the total amount paid to petitioner was bargained for in a fair and bona fide manner. For, in addition to the above, petitioner has the burden of proving what portion of the proceeds received was bargained for either as goodwill or as an adjunct to goodwill. *Redman L. Turner*, 47 T.C. 355, 360 (1967). Moreover, where, as here, the contract of sale contains a recital in which the seller (as part of the consideration being conveyed) agrees not to compete with the buyer the seller must also persuade the Court that the covenant not to compete lacked independent existence, and that its sole purpose for being in the agreement was to provide additional assurance to the buyer that his enjoyment of the goodwill being purchased would not in any way be diminished by the activities of the seller. *Aaron Michaels*, 12 T.C. 17 (1949). See, too, *Alfred H. Thoms*, 50 T.C. 247, 255 (1968); and *Winchell Co.*, 51 T.C. 657, 661 (1969). Absent such a showing, the petitioning party will have failed to meet his burden of proof, and the Court will ascribe to the covenant not to compete whatever value is warranted by the circumstances of the case. See, e.g., *Levine* v. *Commissioner*, 324 F. 2d 298, 302 (C.A. 3, 1963), affirming a Memorandum Opinion of this Court; and *Rodney B. Horton*, 13 T.C. 143 (1949).

In the instant proceeding, petitioner, prior to the sale in question, operated a city directory publishing company—a business which required much personal contact and involvement. The successful perpetuation of this business was, no doubt, directly attributable to his professional skills and talents, and to the relationships which he established over the years. Standing alone, such personal traits—though central to the success of his business—cannot be the subject of a sale of goodwill. *E. C. O'Rear*, 28 B.T.A. 698 (1933), affd. 80 F. 2d 473 (C.A. 6, 1935). Indeed, such personal qualities and skills on the part of a seller are often the reason why a covenant not to compete is requested by the purchaser of his business. However, in this case, we believe there was more to Directory than the individ-

ual talents and successes of its owner; for while petitioner was building a reputation for himself, he was also generating confidence in his customers in the product being sold by Directory—an advantage which, at least initially, would give his successor in business considerable leverage over any competitors. *Edward A. Kenney*, 37 T.C. 1161, 1171 (1962). Indeed, precisely this kind of "advantage," i.e., the expectancy that old customers, content with the quality of services which have been provided to them, will, in the future, return to the same house of business, has been held to constitute goodwill in a variety of cases decided by this Court. See, e.g., *Malcolm J. Watson*, 35 T.C. 203 (1960) (sale of an accounting practice); *Alfred Meurlin*, 25 T.C. 118 (1955) (sale of a medical practice); and *Rodney B. Horton, supra* (sale of an accounting practice). In the instant case, the presence of this kind of goodwill is borne out by the fact that, although petitioner's company did not annually publish a new directory in each community it serviced—a fact which, ordinarily, would have subjected it to the ravages of competition during nonpublishing years— the number of chamber of commerce defections to other publishing companies during the years before us were very few. Accordingly, we see no basis for distinguishing the immediate case from the cases cited above, and we hold that prior to November 15, 1959, Directory did possess goodwill, and that such goodwill was transferred to Southern by virtue of the November 15, 1959, sale between it and petitioner.

Having resolved the above, our task is not yet completed for, as stated earlier, we still must determine what portion of the proceeds received by petitioner was attributable to the sale of goodwill, and what part, if any, was attributable to the other items conveyed, including Charles' covenant not to compete. See *Williams* v. *McGowan*, 152 F. 2d 570 (C.A. 2, 1945), wherein the Court of Appeals developed the now established idea that where an individual proprietor sells a mixed bag of assets constituting a going concern, the proceeds must be allocated among the assets to determine the nature of any gains or losses. Focusing, then, on the present case, we are of the opinion that almost all of the consideration received by Charles was attributable to the sale of goodwill, and that the covenant not to compete was a nonseverable adjunct of goodwill being transferred. See *Aaron Michaels, supra*. In so holding, we are well aware of the fact that not only did Charles enter into the covenant not to compete with Southern, but that he was also controlling shareholder of Southern at the time of the sale in question, and that all parties concerned contemplated his continued service both as an employee and officer. However, where, as here, a new person (Cooke) is involved in the ownership of the new company, we see little basis for holding that a sale of goodwill

could not have taken place merely because the person responsible for generating the goodwill enjoyed by the transferor chose to join the transferee. Indeed, if one accepts the premise that goodwill, when viewed from the transferee's standpoint, represents the opportunity to succeed to the advantages of patronage previously enjoyed by the transferor, then any device which will enable the transferee to garner the customers previously served by the transferor, may well be viewed as an adjunct to goodwill. One way of accomplishing this objective is to furnish the transferee with various "symbols" of the transferor (such as trade name), thereby enabling the clients or customers of the old concern to identify with the new. Similarly, where, as here, the business being transferred is essentially a service-oriented business, a second way of evoking a favorable customer response toward the new company is by removing the transferor as an "alternative attraction" by having him join the new concern as an employee, partner, or officer. See, e.g., *Malcolm J. Watson, supra; Richard S. Wyler*, 14 T.C. 1251 (1950); and *Hoyt Butler*, 46 T.C. 280 (1966).

In the *Watson* case, an accountant sold his business to a larger accounting firm, and then joined the new firm as a partner. In holding that the sale of the accounting business included a sale of goodwill, we employed the following language much of which is pertinent to the discussion herein:

Generally, attitudes of customers or others may be transferred from one proprietor to another * * *.

The two methods usually employed to transfer attitudes of customers are not necessarily unrelated to each other. One method is by removing the transferor as an alternative attraction. * * * [This can be accomplished] by the transferor covenanting not to compete with the transferee * * *. * * * A second method, furnishing the transferee with all the symbols and other transferable attractions, which invoke a favorable response in the customers, suggests an additional device for removing the transferor as an alternative attraction. That is for the transferor to obligate himself to work for the transferee for a given period of time. This not only eliminates the alternative attraction but also furnishes the transferee with one more symbol or attraction which in the past invoked a favorable response in the customers of the old business.

In the immediate case, we view Charles' (a) covenant not to compete, and (b) his affiliation with Southern as being incident to and component parts of the sale of goodwill. Firstly, we are of the opinion that Charles' assumption of the office of president of Southern carried with it an implied promise that, as a corporate fiduciary and key employee, he would not compete with the company by whom he was employed. Accordingly, we view the covenant not to compete in the Charles-Southern agreement of sale as being merely formalistic, and redundant. To be sure, Charles was not obligated to serve as Southern's principal officer or as its employee; however, while Southern was indebted to

him, we think it unlikely that Charles would have terminated his service with the company.

In addition to the above, we are also swayed by the fact that the agreement of sale was barren of any provision apportioning any part of the sales price to Charles' covenant not to compete. Such failure to allocate has, in the past, been treated as strong evidence that no allocation was intended, and we believe the situation is here no different. See *Winchell Co., supra;* and *Annabelle Candy Co.* v. *Commissioner*, 314 F. 2d 1 (C.A. 9, 1962), affirming a Memorandum Opinion of this Court. Finally, viewing the record as a whole, and giving particular weight to Charles' testimony that he intended to one day turn over the entire business to Cooke,[6] we think that Charles' willingness not to compete with Southern was an understood consideration, and that it was *not* "dealt with as a separate item in the [November 15, 1959] transaction." *Gazette Telegraph Co.*, 19 T.C. 692 (1953), affd. 209 F. 2d 926 (C.A. 10, 1954); and *Howard Construction, Inc.*, 43 T.C. 343, 355 (1964).

Having determined that Charles' agreement not to compete was a subordinate part of the sale of goodwill, and that the sale of the latter accounted for a substantial portion of the proceeds received from the November 15, 1959, sale, we must still decide whether any of the other assets sold on that date yielded to Charles' gains of a noncapital variety. However, only if we determine that ordinary income should have been realized on the sale of some or all of these assets, need we determine what portion of the sale price constituted return on the sale of goodwill and related assets, and what portion was attributable to the sale of noncapital assets.

At the outset we think it is important to note that respondent acknowledges that "patronage lists compiled by a directory publisher are sufficiently similar to the usual 'customer list' * * * to be recognized as capital assets * * * [and that] Common sense dictates that enumeration lists, i.e., a listing of business entities, institutions and residents of any given town or locale by street name and building or house number, could qualify as capital assets." We are in agreement with respondent and hold that the patronage lists and enumeration lists conveyed to Southern constituted capital assets. See *Aaron Michaels, supra*, and cases cited therein; and *Golden State Towel and Linen Service, Ltd.* v. *United States*, 373 F. 2d 938, 944 (Ct. Cl. 1967), wherein the following was said:

Summing up, a purchased terminable-at-will type of customer list is an indivisible business property with an indefinite, nondepreciable life, indistinguishable from—and the principal element of—goodwill, whose ultimate value lies in the expectancy of continued patronage through public acceptance. * * *

---

[6] Absent any evidence to the contrary, we view Cooke's later departure from the business as being strictly fortuitous.

With these things in mind our task is considerably lightened since, absent Directory's patronage lists and enumeration lists, our study of the record leads us to the conclusion that little else passed to Southern by way of the November 15 agreement. There is some suggestion that certain directory libraries and recent directory issues may have passed to Southern in the above transaction (see fn. 2, *supra*); however, even respondent asserts that these items were retained by Charles. In any event, even if we were to hold that these assets did pass to Southern, we would still view them as being connected to the patronage and enumeration lists, and, therefore, capital in nature. Indeed, no argument has been made that these assets constituted ordinary income items in the nature of inventory, or, for that matter, that any inventory items passed in the transaction. Finally, the parties are in agreement that all of Directory's accounts receivable were retained by Charles. These things being so, *except as limited by our discussion in issue 2, infra*, we hold that the consideration received by Charles as a result of the November 15, 1959, sale constituted capital gain.

*Issue 2. Whether, on August 21, 1965, Southern Experienced a Loss of $110,000 as a Result of the Sale of Its Assets to the Mullin-Kille Co.*

On August 21, 1965, Southern and the Mullin-Kille Company of Ohio (Mullin) entered into an agreement whereby Southern purported to sell to Mullin all of its (Southern's) files and records for the sum of $3,000.[7] On this same day Charles entered into a consulting and noncompetition agreement with Mullin whereunder Charles agreed (*inter alia*) to assist Mullin in publishing directories for the communities previously serviced by Southern, and to refrain from competing with Mullin during the 10-year term of the agreement. In consideration of the above, Charles was to receive approximately $110,000 payable in monthly installments of $835 over a period of 119 months.

As a result of its transaction with Mullin, Southern claimed that it had experienced a loss of $110,000. Moreover, because of the "show cause" order which it had received in conjunction with the petition filed by the Justice Department (see pages 642 through 644 of our Findings of Fact), it treated this loss as a section 1231 loss on the ground that it had been required, under Government compulsion, to divest itself of the transferred assets. Our task is to determine whether Southern did, in fact, experience a loss as a result of the August 21, 1965, sale to Mullin. Only if we resolve this question, in whole or in part, in the affirmative will it become necessary for us to determine whether such loss is deductible under sections 1231(a) and 165(a).[8]

---

[7] See fn. 4, *supra*.

[8] SEC. 165. LOSSES.

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

Footnote continued on following page.

At the outset we deem it important to note that this issue was not very zealously pursued by either party. However, be that as it may, we have carefully reviewed the record, and have determined that respondent acted properly in disallowing the losses claimed by petitioner.[9]

Subsequent to August 1961, the month in which Cooke left Southern's employ, Southern was run as a "one man" business, with Charles being the "one man." Hence, though no question exists as to the separateness of Charles and his controlled corporation, see *Moline Properties* v. *Commissioner*, 319 U.S. 436 (1943), it is equally beyond dispute that without Charles, Southern would have been a hollow shell. Moreover, without Charles' continued participation in its business activities, all the goodwill and all of the customer and enumeration lists which Southern purchased in 1959 would have become practically valueless. Accordingly, when, on August 21, 1965, Southern—in the personage of Charles, its president—permitted Charles, in his individual capacity, to accept employment with Mullin, several things occurred. Firstly, since (from Southern's standpoint) the Charles-Mullin agreement was not limited as to geographic area, Charles' entrance into the agreement with Mullin constituted a breach of the remaining 4⅓ years on his 1959 covenant not to compete. Secondly, because Charles' continued service to Southern during the remaining years of his 1959 covenant represented the only way in which Southern could hope to continue benefiting from its November 1959 purchase of goodwill, Southern's condonation of Charles' breach, when coupled with the fact that Southern and Charles were, essentially, one and the same, indicates that, as of August 21, 1965, Charles, both as corporate officer and individual, viewed the November 1959 agreement as having come to an end.[10] Consequently, any distributions made to Charles by Southern which were received by him subsequent to August 21, 1965, cannot, in our estimation, be regarded as gain from the November 1959 sale of goodwill. Any such distributions must, instead,

Footnote continued from previous page.

SEC. 1231. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS.

(a) GENERAL RULE.—If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sale or exchanges of capital assets. * * *

[9] Because the $110,000 loss claimed by petitioner during 1965 exceeded its income for that year, a net operating loss was claimed in 1965. Part of this loss was carried over to the following year as a sec. 172 net operating loss deduction.

[10] The possibility that Southern's relinquishment of its rights under the November 1959 agreement may have constituted a constructive dividend to Charles has not been asserted by respondent. Accordingly, we do not consider it as now being before us.

be treated as either salary or dividends.[11] To this end, we have studied the record in an effort to determine what portion, if any, of the $11,000 received by Charles during 1965, and treated by him as capital gain, was distributed to him after August 21, 1965. Though our search yielded little information, on our best judgment we conclude that, of the $11,000 distributed, $3,500 was received by Charles subsequent to August 21, 1965. Accordingly, this amount and the $30,000 received by Charles during 1966 must be treated as a distribution in the nature of a dividend, and taxed at ordinary-income rates to the extent that Southern possessed current and/or accumulated earnings and profits during these years. (See secs. 301 and 316.)

Finally, not only do we conclude that the events of August 25, 1965, constituted an abrogation of the November 1959 agreement between Charles and Southern, but we also believe that, as a result of the above, there occurred a divestiture of all of Southern's goodwill associated with Charles' ability, during the 4⅓ years then remaining on his 1959 covenant not to compete, to exploit the communities covered by said covenant. Accordingly, since the communities enumerated in the 1959 agreement between Charles and Southern were identical to the communities covered by Charles' 1965 contract with Mullin, we are of the opinion that this last mentioned transaction resulted in the loss to Southern of all of its goodwill. Hence, it is our conclusion that when Southern entered into the agreement of sale with Mullin, it was able to sell no more than the naked right to its files and records. There being no indication that its basis in these items, unembellished by its previously held goodwill, exceeded $3,000, we conclude, as stated earlier, that no loss was sustained by Southern during the year 1965.[12]

*Decisions will be entered under Rule 50.*

---

[11] In holding as we have, we have intentionally left undisturbed petitioner's treatment of the accelerated payments received from Southern prior to 1965, and attributable to the November 1959 sale. This is because, in the main, we view the events of Aug. 21, 1965, as having been precipitated by the "show cause" order and summons which was received by Southern during May 1965. Absent the fear of criminal prosecution engendered by the receipt of these documents (irrespective of whether such fear was at all justified), our study of the record leads us to believe that the transactions which occurred on Aug. 21, 1965, would never have taken place. Accordingly, we view all payments made by Southern prior to 1965, whether or not accelerated, as having been made with the expectation that Charles would remain with Southern, and that Southern would continue to benefit from the goodwill purchased by it during 1959.

[12] We realize that our analysis of the immediate issue is based, in part, on the chronological assumption that Charles' agreement with Mullin occurred prior to the Southern-Mullin agreement of sale. However, we do not feel that this tack in any way, weakens the result we have reached. For, whenever two purportedly separate transactions are, by all indications, part of one unified plan, the arbiter of fact is free to align such transactions, both conceptually and chronologically, in whatever manner best reflects the realities of the situation. *Commissioner* v. *Court Holding Co.*, 324 U.S. 331 (1945) ; and *United States* v. *Carey*, 289 F. 2d 531 (C.A. 8, 1961). In this case, we think it is fairly evident that all of the events which occurred on Aug. 21, 1965, were part of an integrated plan. This is evidenced by the interdependent nature of the two agreements entered into with Mullin. (See, e.g., pars. 2 and 3 of the Mullin-Southern agreement which provides for the return to Southern of all the transferred files and records in the event that Charles should terminate his relationship with Mullin, an eventuality which, under par. 5 of the Charles-Mullin agreement, was totally within Charles' power.) Accordingly, since we feel that we have, by our analysis, captured the true nature of what really took place on Aug. 21, 1965, we are not concerned that, in a sterilized world devoid of economic reality, the events of that day may have occurred in a chronological order other than that which we have found to be the case.