GEORGE F. BACON and HELEN R. BACON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bacon v. Commissioner
Docket No. 1259-75.
United States Tax Court
T.C. Memo 1977-52; 1977 Tax Ct. Memo LEXIS 389; 36 T.C.M. (CCH) 231; T.C.M. (RIA) 770052; March 2, 1977, Filed *389 After extensive arm's-length negotiations petitioners sold their insurance agency for a lump sum. The agreement of sale contained a convenant by petitioners not to compete with no price or value assigned thereto. Held, there is no evidence that in the negotiated agreement the parties attached any independent significance to the covenant not to compete or intended that any part of the purchase price should be allocated thereto. Respondent may not allocate any part of the purchase price to the covenant not to compete. Petitioners correctly reported the proceeds of sale as long-term capital gain. John W. Sabo III , Daniel P. Edwards, and Bruce N. Warren, for the petitioners. Charles H. Cowley, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: *390 Respondent determined deficiencies in petitioners' income taxes for the years 1970, 1971, and 1972 in the amounts of $982, $129, and $604, respectively. The sole issue for decision is whether respondent properly determined that a portion of the consideration received by petitioners under an installment sale of their insurance agency is allocable to a covenant not to compete and thus taxable as ordinary income.
FINDINGS OF FACT Some of the facts have been stipulated and together with the exhibits attached thereto are incorporated herein by this reference. Petitioners, George F. Bacon and Helen R. Bacon, are husband and wife and resided in Colorado Springs, Colo., at the time of filing the petition herein. Petitioners timely filed joint income tax returns for the years 1970, 1971, and 1972, with the Internal Revenue Service. Petitioner George F. Bacon (hereinafter Bacon) began selling insurance in El Dorado, Kan., in 1938. Bacon founded the business and conducted it as a sole proprietorship under the name of Bacon Insurance Co. (sometimes hereafter referred to as company). Bacon was engaged in a general insurance business, writing casualty, fire, health, workmen's compensation, *391 life, automobile, liability, and any other sort of insurance. In 1943 petitioner Helen R. Bacon (hereinafter Helen) joined her husband in the operation of the company. [1] Helen's responsibilities included discharging the administrative duties inherent in the business; she did not solicit or sell insurance. In 1958 petitioners hired William R. Calloway (hereinafter Calloway) as an agent and employee of the company. Prior to this time Calloway had no knowledge or experience with respect to the insurance business; he learned all aspects of the insurance business during his employment with the company. At the time petitioners hired Calloway they tentatively planned to retire from the insurance business in approximately 10 years; pursuant to that desire, he was hired with a view toward having him eventually take over the business. Although Calloway served as a salaried employee of the company, he did receive 50 percent of all commissions generated from his sale of life insurance, which was negligible. In 1959 *392 or 1960 Bacon purchased a one-third interest in a bowling alley located in El Dorado which opened for business in 1961. After his investment in the bowling alley Bacon was increasingly involved in that business acting as chief administrative officer and devoting a substantial amount of his time thereto. As a result, he devoted less and less time to the insurance business. By 1963 Bacon owned a one-half interest in the bowling alley and spent very little time with the insurance business. Subsequent to Bacon's involvement in the bowling alley, Helen acted as manager of the insurance business and Calloway continued as an employee. As a result of Bacon's involvement in the bowling business and the conflicting work schedule of Helen at the insurance agency, sometime during 1965 petitioners decided to accelerate their planned retirement from the insurance business and sell the company. To that end negotiations were begun with Calloway and Thomas C. Hand, a personal friend of Calloway's who was invited by Calloway, for personal and financial reasons, to join in the purchase of the company. Several meetings were held by petitioners and Calloway and Hand at petitioners' home where negotiations *393 as to the proposed sale and purchase were undertaken. The negotiations culminated in an oral agreement between the parties which was subsequently reduced to writing by an attorney who was engaged jointly by the sellers and the buyers. The written agreement was dated and executed January 1, 1966; pertinent parts thereof are set out below: THAT WHEREAS, First Parties are the owners of an insurance agency in El Dorado, Kansas, * * * and WHEREAS, First Parties desire to sell and Second Parties desire to purchase such insurance agency for the consideration and upon the terms and conditions hereinafter expressed. IT IS THEREFORE AGREED by and between the parties hereto as follows: 1. First Parties agree to sell and Second Parties agree to purchase as of this date such insurance agency for the sum of $56,072.59 payable as follows: $10,000.00 thereof to be paid by Second Parties to First Parties upon the signing of this agreement, and the remaining $46,072.59 in monthly installments of $500.00 each commencing on January 31, 1966, and on the last day of each month thereafter for 120 months, at which time such purchase price will be fully paid, including interest on the unpaid balance at *394 the rate of five and onehalf per cent per annum. Such payments shall be first applied on interest and then on principal. Second Parties shall not have the right to accelerate such payments, or any of them, without the prior consent of First Parties. 2. Included in such purchase price is all furniture, fixtures, equipment and a certain 1955 Nash Rambler, Engine No. 108342, all used in connection with such business and valued in accordance with Exhibit "A" [2] which is attached hereto. 3. Also included in such purchase price is the trade name "Bacon Insurance", which Second Parties may use so long as they desire and for which no monetary consideration is place hereunder. 4. Such purchase price includes the acquisition by Second Parties of all expirations of insurance and daily reports as of January 1, 1966, and all books, records and files pertaining to such business which shall become the property of Second Parties; however, Second Parties shall keep them on the premises occupied by such business *395 for at least five years from this date, and give First Parties access to the same at all reasonable times. 5. First Parties shall retain all accounts receivable for all premiums due prior to January 1, 1966, and shall retain all commission adjustments and contingent commissions applicable to all premiums due prior to January 1, 1966. * * *
9. First Parties agree that they will not directly or indirectly compete in the insurance business within the confines of Butler County, Kansas, for a period of 10 years from this date, except for such life insurance which First Parties may desire to write. * * *
12. If payment of the balance of the purchase price is accelerated by mutual consent of the parties hereto, a proportionate reduction shall be made in the interest applicable to the period of time under which the payments are accelerated. Nowhere in the written agreement or the attached schedule was there any allocation of the purchase price to any of the assets conveyed including the covenant not to compete contained in paragraph 9, supra. Bacon arrived at his asking price for the business by applying a "rule of thumb" for valuing an insurance agency of 1-1/2 times the annual gross *396 premiums. The gross premiums reported by the Bacons for 1964 were approximately $40,000; applying the rule of thumb would produce a price of $60,000. The parties agreed that the purchase price was to be paid $10,000 down and the balance in monthly payments of $500 over a period of 10 years.Since the monthly payments were to be applied first to interest on the unpaid balance, an accountant was asked to compute the total amount of interest that would be included in the $60,000 of monthly payments and subtract that figure from the total payments of $70,000 ($10,000 down plus $500 per month for 10 years) to arrive at a figure to be used as the purchase price. This resulted in the figure of $56,072.59 that was stated as the purchase price in the agreement. [3] At no time during the negotiations between the parties was there a discussion of allocating any part of the purchase price or assigning any specific *397 value to any of the assets enumerated in the sales agreement nor to the covenant not to compete.When the terms of the sale were agreed upon between the parties they went to an attorney and asked him to incorporate the agreed-upon terms and conditions in a written agreement, which the attorney did. There was no discussion with the attorney, nor with an accountant, prior to the execution of the written agreement with respect to allocating any part of the purchase price to any specific asset or the covenant not to compete, or assigning any value thereto. At the time of the negotiations and sale Bacon had no intention of re-entering the insurance business except to continue servicing several life insurance policies he had previously sold. Nevertheless, he recognized that noncompete provisions were usually included in agreements involving the sales of insurance agencies and he had no objection to the inclusion of such a provision in this agreement. On the other hand, while Calloway and Hand may not have been very familiar with formal covenants not to compete, they would not have purchased the agency without assurance that Bacon would not compete with them in the insurance business for *398 a reasonable length of time. Petitioners elected to report their gain from the sale of the insurance agency under the installment method pursuant to section 453, I.R.C. 1954. [4] On their joint returns for the years at issue herein petitioners reported the portion of the proceeds received which represented their gain as long-term capital gain, being in the amounts of $3,702.71 for 1970, $3,911.55 for 1971, and $4,132.20 for 1972. Consistent with the terms of the sales agreement, petitioners reported as interest income the portion of the installment payments received which represented 5-1/2 percent annual interest on the applicable outstanding balance. The corporation which was formed by Calloway and Hand to carry on the insurance business after its purchase, Bacon Insurance Co., Inc., accounted for the transaction in a different manner for tax purposes. Of the total purchase price mentioned in the agreement, $56,072.59, the corporation treated $49,400 of said amount as consideration paid for petitioners' covenant not to compete. Accordingly deductions were claimed for amortization *399 of the purported cost of the covenant over its 10-year life under section 167(a) and the regulations thereunder. Apparently the returns of petitioners for several years after the sale were not audited by respondent. But upon audit of their returns for the years here involved respondent noted the divergent treatment of the sale and purchase of the agency reported by the respective parties on their tax returns. Accordingly, respondent determined that $3,367 of the proceeds of sale received by petitioners in 1970, $3,617 in 1971, and $3,881 in 1972 were received as consideration for the covenant not to compete and were thus taxable as ordinary income, giving rise to the deficiencies here in issue. There was no explanation in the notice of deficiency of how respondent arrived at his determination, but upon inquiry by the Court, counsel for respondent advised that the adjustments made to petitioners' income were not the result of a computation or allocation made by respondent but were the exact reciprocals of deductions claimed on the returns of Bacon Insurance Co., Inc., for amortization of the cost allocated by it to the covenant not to compete. During the year after the purchase *400 of the insurance agency, the renewed business from the expiration lists and customer policies acquired by the purchasers generated commissions in the vicinity of $30,000. After consummating the sales agreement, and upon termination of Helen's temporary employment with the Bacon Insurance Co., Inc., neither petitioner engaged in the insurance business in El Dorado, Kan., or elsewhere. ULTIMATE FINDING OF FACT On the evidence presented, no part of the payments received by petitioner during the years 1970, 1971, and 1972 as part of the purchase price of the insurance agency was allocable to the covenant not to compete. OPINION Petitioners entered into a written agreement for the sale of their unincorporated insurance business in consideration for a lump-sum purchase price payable in installments over a period of 10 years. Included in the agreement was a covenant by petitioners not to compete with the purchasers in the sale of insurance, except for the sale of life insurance, within the county in which the business had been conducted; by its terms, the covenant was also to extend over a period of 10 years from the date of the agreement. However, neither orally during negotiations nor *401 in the final written agreement did the parties specifically allocate the aggregate purchase price among the assets being conveyed, including the covenant not to compete. In this context we are presented with the oftlitigated question of what portion of the purchase price, if any, is to be allocated to the covenant not to compete. The tax consequences flowing from the determination of whether or not a portion of the purchase price was paid for the covenant not to compete are significant to both the seller and buyer. Amounts paid for a covenant are ordinary income to the covenantor and may be amortized over the useful life of the covenant by the purchaser. Hamlin's Trust v. Commissioner, 209 F. 2d 761 (10th Cir. 1954); Libero P. Baldarelli, 61 T.C. 44 (1973); J. Leonard Schmitz, 51 T.C. 306 (1968), affd. sub nom. Throndson v. Commissioner, 457 F. 2d 1022 (9th Cir. 1972). See also (A)-3 (A)-3 (A)-3 sec. 1.167 (a)-3, Income Tax Regs. Generally, however, if the covenant was not separately bargained for and was merely transferred with the overall business as an adjunct to the goodwill, then the seller will be entitled to capital gains treatment for the entire proceeds and the purchaser *402 allowed no deduction. General Insurance Agency, Inc. v. Commissioner, 401 F. 2d 324 (4th Cir. 1968), affg. a Memorandum Opinion of this Court; Aaron Michaels, 12 T.C. 17 (1949). The question of whether petitioners received consideration for their covenant not to compete is a question of fact to be determined from an examination of the record as a whole. Normally petitioners would have the burden of proving error in respondent's determination. Rule 142(a), Tax Court Rules of Practice and Procedure. However, in the context of this case we cannot place a very heavy burden on petitioners. Neither in the notice of deficiency nor by way of evidence adduced at the trial did respondent offer any explanation of how he determined the amount he allocated to the covenant not to compete. In answer to the Court's inquiry counsel for respondent stated, in effect, that respondent made no independent determination of the value of the covenant but simply used the value assigned thereto by the purchaser in its tax returns. While Calloway testified at the trial, he gave no explanation of how the $49,400, or about 90 percent of the stated purchase price, allocated to the covenant by his accountant *403 was determined. Under these circumstances, we feel respondent is standing in the shoes of the purchaser and that the issue must be decided on the preponderance of the evidence. In any event we find on the record before us that petitioners have carried whatever burden of proof they had and their position must be sustained. Courts have applied several standards in deciding whether to allocate a portion of the purchase price for the sale of a going business to a covenant not to compete. One of these is referred to as the "severability test" which appears to be used by the Tenth Circuit, to which an appeal in this case would lie. See Jack E. Golsen,54 T.C. 742 (1970), affd. 445 F. 2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). In Commissioner v. Gazette Tel. Co.,209 F. 2d 926 (10th Cir. 1954), the Tenth Circuit enunciated the rule as follows: Where a lump sum is paid for the properties of a going business together with intangibles and a covenant on the part of the seller not to compete with the purchaser or his assignee for a specified period of time, and the covenant against competition is not treated separately in respect to cost and value but is nonseverable, the *404 purchaser has no warrant in the statute or the regulation to treat any part of the price paid as the cost of the covenant subject to depreciation. Toledo Blade Co. v. C.I.R., 11 T.C. 1079, affirmed, 6 Cir., 180 F. 2d 357, certiorari denied, 340 U.S. 811, 71 S. Ct. 38, 95 L. Ed. 596; Burke, 18 T.C. 77. On the other hand, in a transaction in which property is sold and the seller covenants not to engage in business in competition with the purchaser for a specified period of time, if the parties in good faith and realistically treat the covenant in a separate and severable manner in respect to value and cost the purchaser may amortize the price paid for the covenant and claim annual deductions pro rata during the life of the covenant. * * * [209 F. 2d at 928.] See also Edward A. Kenney,37 T.C. 1161 (1962). Another standard applied by the courts in cases involving this issue is referred to as the "economic reality test" under which the court seeks to determine whether the parties to the agreement intended to allocate a portion of the purchase price to the covenant not to compete and whether such allocation establishes that the covenant had an independent basis in fact or some relationship *405 to business reality. Schulz v. Commissioner,294 F. 2d 52 (9th Cir. 1961), affg. 34 T.C. 235 (1960); Charles W. Miller,56 T.C. 636 (1971). Whichever standard is used, we believe petitioners must prevail in this case. Bacon had become involved in the bowling business about 5 years before he sold the insurance business to Calloway and was devoting very little of his time to the insurance business. Helen was operating the insurance business but because of the conflict in their time schedules both petitioners wanted to get out of the insurance business. They negotiated at length with Calloway and Hand for the sale of the agency and all that went with it, the name, the tangible property, the records, the customer lists, the insurance expirations, etc. There was no bargaining on the value of the individual assets and apparently a covenant not to compete was given little or no consideration in the negotiations. When the terms were finally agreed upon they asked an attorney to draft a formal written agreement embodying those terms. No mention was made of allocating a portion of the agreed-upon price to any specific assets. The written agreement was drawn as a sale of the agency for *406 a lump sum. A covenant by petitioners not to compete was incorporated in the written agreement, at whose suggestions is not clear. No value was assigned to it. We have no doubt that the covenant would have been deemed to have value to the purchaser had consideration been given to it--Bacon had been the principal insurance agent in the locality for many years. But the covenant was of no value to petitioners; they had no intention of going back into the insurance business and made no effort to obtain a consideration for their covenant not to compete. Nor did the covenant have any independent significance to the purchasers--it was of value to them simply to protect the goodwill and going business they were buying. It was not severable from the transfer of goodwill attendant to the sale of an ongoing business. See Aaron Michaels,supra.Furthermore, since the term of the covenant was coextensive with the term over which the purchase price was to be paid, the purchasers could be sure that the covenant would not be violated without affixing a monetary value to it. It is clear from the evidence that the parties did not intend to allocate any part of the purchase price to the covenant *407 not to compete. Such an allocation was not mentioned throughout the negotiations or at the time the sale was consummated. It was not until the purchasers' accountant began preparing its income tax return that the matter came up. The evidence does not disclose how he arrived at his allocation but an allocation of 90 percent of the sales price to a covenant not to compete under these circumstances was certainly unrealisticc. Bacon had not actively participated in the insurance business for about 5 years and the agency continued to produce substantial income. In fact Calloway testified that the agency realized at least $30,000 in income during the year following the sale from customers that were on the books at the time of the sale. It is evident that the goodwill, the expiration lists, and the going business were responsible for most of the value of the agency to the purchasers. Furthermore, Bacon testified that he was aware that a sale of the agency would constitute capital gain for tax purposes and that he would not have sold the business for the agreed-upon price had he thought any part of the purchase price would be taxable as ordinary income. Indeed it is doubtful that the *408 purchasers would have agreed to pay interest on the unpaid portion of the purchase price had it been paid for a covenant not to compete. [5]
It is true that where an agreement contains a covenant not to compete, negotiated for by the parties but without agreement as to the value to be assigned to it, the Court may allocate a portion of the purchase price to the covenant where it finds that it had independent value. Harry A. Kinney,58 T.C. 1038 (1972). And the failure of the contracting parties to allocate a part of the consideration to the covenant not to compete is not conclusive by itself--but it is strong evidence that no such allocation was in fact intended. Charles W. Miller,supra.But where as here the parties negotiated a lump-sum sales price at arm's length and neither party mentioned, nor was any consideration given to, allocating a part of the price to a covenant not to compete, we will not attempt to rewrite the contract for the parties and force upon them an agreement different from that they bargained for and consummated. Delsea Drive-In Theaters, Inc. v. Commissioner,379 F. 2d 316 (3rd Cir. 1967); Annabelle Candy Co. v. Commissioner,314 F. 2d 1 (9th Cir. 1962). *409 In fact we have no evidence upon which to make an allocation of the purchase price to the covenant not to compete, were we inclined to do so. [6] Where the interests of the parties are adverse, it is incumbent on the party claiming a benefit from certain provisions to see to it that those provisions are duly spelled out in the agreement. We conclude that no part of the amounts received by petitioners for the sale of their insurance agency is allocable to the covenant not to compete. Decision will be entered for the petitioners.* Footnotes
1. At some point in time after Helen joined the company, the business was operated as a partnership; a partnership informational tax return, Form 1065, was filed for the year 1964.↩
2. Exhibit A included an extensive list of various items of personal property but did not include any statement of the value to be assigned thereto nor any formula for establishing a valuation.↩
3. There was some disagreement in the testimony of Bacon and Calloway as to how the lump-sum purchase price was arrived at but this seems to the Court to be the most logical explanation for the odd amount used in the agreement, giving due consideration to the testimony of both witnesses.↩
4. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.↩
5. See Arthur L. Sigman,T.C. Memo. 1972-256↩.
6. Compare Herbert E. Baker,T.C. Memo. 1976-133↩.