JEROME H. STERN, SHIRLEE STERN, PHILIP BRODY, HELEN BRODY, ALBERT BRODY, SALLY BRODY, HAROLD COHEN, THELMA COHEN, LEWIS COHEN, AND PEARL COHEN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4750-74.    Filed April 13, 1976.

John K. O'Connor, for the petitioners.
Seymour I. Sherman and Paul G. Topolka, for the respondent.

SIMPSON, *Judge:* The Commissioner determined the following deficiencies in the petitioners' Federal income taxes:

| Petitioners | Year | Deficiency |
|---|---|---|
| Jerome H. Stern and Shirlee Stern _____ | 1968 | $12,269.47 |
| | 1969 | 86,148.62 |
| | 1970 | 98,189.08 |
| Philip Brody and Helen Brody _____ | 1968 | 17,397.00 |
| | 1969 | 105,021.00 |
| | 1970 | 95,820.00 |
| Albert Brody and Sally Brody_____ | 1968 | 14,689.00 |
| | 1969 | 100,580.00 |
| | 1970 | 94,440.00 |
| Harold Cohen and Thelma Cohen_____ | 1968 | 12,142.00 |
| | 1969 | 87,981.00 |
| | 1970 | 103,181.00 |
| Lewis Cohen and Pearl Cohen _____ | 1968 | 9,604.00 |
| | 1969 | 76,234.00 |
| | 1970 | 88,566.00 |

Most of the adjustments made by the Commissioner have been settled by the parties; the only issue remaining for our consideration is whether Merit Insurance Co.'s payment of $106,404.79 was deductible as a ceding commission or was paid for the acquisition of an intangible capital asset.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

All the petitioners maintained their legal residences in the State of Illinois when the petition herein was filed. For the years 1968, 1969, and 1970, joint Federal income tax returns were filed with the Internal Revenue Service Center, Kansas City, Mo., by: Jerome H. Stern and Shirlee Stern, husband and wife; Philip Brody and Helen Brody, husband and wife; Albert Brody and Sally Brody, husband and wife; Harold Cohen and Thelma Cohen, husband and wife; and Lewis Cohen and Pearl Cohen,

husband and wife. All the petitioners used the cash method of accounting on their Federal income tax returns.

Merit Mutual Insurance Co. (Mutual) was organized under the laws of Illinois on July 11, 1961, as a mutual insurance company. A mutual insurance company has no shareholders. The policyholders of the mutual insurance company are the "owners" of the company, in that upon liquidation, if assets exceed liabilities, the surplus is distributable to the policyholders. Moreover, Mutual's policyholders were entitled to any dividends declared by Mutual (Ill. Ann. Stat. ch. 73, sec. 666 (Smith-Hurd 1965)), and they were also entitled to vote on any proposed merger or consolidation of Mutual (Ill. Ann. Stat. ch. 73, secs. 770, 771, and 780 (Smith-Hurd 1965)).

The initial surplus funds necessary for the operation of Mutual were provided by individuals called "sponsors," who originally advanced to Mutual $200,000, the minimum amount required under Illinois insurance law in effect for 1961. Ill. Ann. Stat. ch. 73, sec. 655 (Smith-Hurd 1965). As of December 1968, $250,000 of surplus had been lent to Mutual by its sponsors. When a sponsor advanced such funds to Mutual, he was issued a guaranty fund certificate as evidence of such advance. Upon the liquidation of Mutual, the holders of the guaranty fund certificates were entitled to repayment of the amounts stated in the certificates out of Mutual's surplus, if it were sufficient, before the policyholders could share in such surplus. Ill. Ann. Stat. ch. 73, sec. 668 (Smith-Hurd 1965). As of December 1968, the sponsors of Mutual were Jerome H. Stern, Albert C. Brody, Philip Brody, Harold B. Cohen, and Lewis X. Cohen, and the amount of guaranty fund certificates held by each was $50,000.

In accordance with Illinois insurance law in effect during 1968, the management of Mutual was entrusted to a board of directors, who selected the officers of the company. Ill. Ann. Stat. ch. 73, sec. 652 (Smith-Hurd 1965). During 1968, the principal officers and members of Mutual's board of directors were as follows:

| Officers | Directors |
|---|---|
| Harold B. Cohen, chairman of the board of directors | Albert C. Brody |
| | Philip Brody |
| Jerome H. Stern, president (since November 1965) | Harold B. Cohen (from July 1, 1968) |
| Albert C. Brody, secretary-treasurer | Jerome H. Stern |
| John Odom, vice president | Lewis X. Cohen |
| Paul E. Frederick, vice president | (resigned July 1, 1968) |

Mutual commenced business on August 7, 1961, the date it received its charter. Mutual's charter authorized it to write insurance against any loss or liability resulting from or incident to the ownership, maintenance, or use of any vehicle (motor or otherwise), as defined in section 616 of chapter 73 of the Illinois Revised Statutes. It was not authorized by its charter to issue any life, accident, or health insurance policies. Consequently, after Mutual commenced business and until its merger on December 31, 1968, it issued automobile liability insurance policies, covering bodily injury, property damage, and physical damage to an automobile. The policies were issued for a term of 6 months or 1 year. A policyholder did not have an automatic right to renew his policy because Mutual could refuse to renew such policy.

The policies issued by Mutual were assessable, that is, in the event of any deficit in Mutual's operation, such policyholders would be liable to Mutual for an amount equal to one additional premium. However, after July 18, 1967, Mutual could not make, levy, or impose upon its policyholders any assessment based on their contingent liability, unless ordered to do so by the director of insurance. Ill. Ann. Stat. ch. 73, sec. 667 (Smith-Hurd, Cum. Ann. pocket part 1975-1976).

During 1968, Mutual wrote automobile insurance policies in the States of Illinois and New York. Mutual received the bulk of its applications for insurance from its exclusive general agent, Skyway Management Agency, Inc. (Skyway). In 1968, Mutual paid Skyway a 30-percent commission for each insurance policy issued by Mutual on an application which had been submitted by Skyway. Skyway obtained such insurance applications from producing brokers who dealt directly with each prospective insured. In 1968, producing brokers received from Skyway a commission ranging from 20 to 22½ percent for each policy issued. Every time an insurance policy with Mutual was renewed, Mutual was required to pay the general agent, which was usually Skyway, a full additional commission, and the general agent, in turn, was required to pay a full additional commission to the producing broker.

Sometime in October 1968, or prior thereto, the sponsors of Mutual decided that they wanted to set up a stock insurance company because they wanted to diversify into other lines of insurance, and because they believed that policies of a stock

company could be sold more easily than policies in a mutual company. To carry out that decision, the petitioner, Jerome H. Stern, in October 1968, informally discussed with Mr. John F. Bolton, Jr., then director of insurance for the State of Illinois, the possibility of forming a stock insurance company. Mr. Bolton stated that he very much favored the formation of a stock company and the transfer of Mutual's business to it. However, he would not approve the formation of a stock insurance company and the retention of Mutual's charter for its possible sale at a later date. Mr. Bolton's position reflected the policy of the Illinois Department of Insurance at that time, which was to discourage the continued existence of small assessable mutual insurance companies. The department had adopted such policy because a number of such small mutual insurance companies had experienced serious financial problems in the Sixties.

In view of the policy of Mr. Bolton and the Department of Insurance, the sponsors recognized that if they were to form a stock company, Mutual would have to be terminated soon. As a matter of law, they could not cancel all the policies then outstanding. It was not clear that the department would approve of the continuation of Mutual until all such policies ran out, and as a matter of business judgment, it would have been unwise to continue Mutual for that purpose. Consequently, the sponsors decided to transfer the existing Mutual policies to the stock company to be formed.

Pursuant to this plan, on December 3, 1968, Merit Insurance Co. (Merit) was organized under the laws of Illinois as a stock insurance corporation. On December 3, 1968, and during the other taxable years at issue herein, the holders of Merit's outstanding capital stock were Jerome H. Stern, Albert C. Brody, Philip Brody, Harold B. Cohen, and Lewis X. Cohen, and each owned 80,000 shares. During December 1968, and throughout the taxable years at issue herein, the principal officers of Merit and its board of directors were as follows:

| Officers | Directors |
|---|---|
| Jerome H. Stern, president | Albert C. Brody |
| | Philip Brody |
| Albert C. Brody, secretary | Harold B. Cohen |
| | Jerome H. Stern |
| | Lewis X. Cohen |

The shareholders of Merit, in December 1968, executed and filed with the Commissioner an election to have Merit taxed under sections 1371 through 1379 of the Internal Revenue Code of 1954 [1] (subch. S).

On December 3, 1968, Merit and Mutual executed an agreement entitled "reinsurance agreement," in which Merit assumed 100 percent of Mutual's liability under the policies written by Mutual and in force on that date. However, Merit's liability only applied to losses incurred on or after that date. Under the reinsurance agreement, Merit was to receive as consideration for its assumption of Mutual's liability 100 percent of the unearned premiums on the policies reinsured by Merit, less a "ceding commission" of 20 percent of such unearned premiums which was to be retained by Mutual.

It was standard practice in the insurance industry for the reinsurer (here, Merit) to pay to the reinsured (here, Mutual) a "ceding commission" in connection with a reinsurance agreement. The "ceding commission" was normally paid as a reimbursement for the expenses incurred by the reinsured for writing the reinsured policies, such as the commissions paid to the general agent and other general overhead costs. Moreover, under Illinois insurance law in effect during 1968, Merit and Mutual could not enter into the reinsurance agreement, without the written approval of the director of insurance. Ill. Ann. Stat. ch. 73, sec. 786 (Smith-Hurd 1965). Although the director did not require a ceding commission in a specific amount, he required a ceding commission which was fair, under the circumstances, before he would approve a reinsurance agreement. When the reinsured was a mutual company, he was especially concerned that it receive a fair ceding commission, because an inadequate commission could cause a deficit which could be assessed against the policyholders, and because an inadequate one would in any event improperly reduce the surplus to be divided among the policyholders. The 20-percent ceding commission provided for in the reinsurance agreement between Merit and Mutual was regarded as fair and reasonable by Mr. Bolton.

Mr. Bolton testified that he approved the reinsurance agreement between Merit and Mutual, and to the best of his knowledge, evidenced such approval by signing it. However, his

---

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect during the years at issue, unless otherwise indicated.

signature does not appear on the copy of the reinsurance agreement on file with the Illinois Department of Insurance.

On December 18, 1968, Merit and Mutual executed an "agreement and plan of merger" (merger agreement). Under paragraph 2 of that agreement, Mutual sold, transferred, assigned, and conveyed to Merit the following: contracts of insurance issued by Mutual now outstanding on all of Mutual's outstanding insurance policies; all of Mutual's business, sales, and agency organization, goodwill and advertising, money, surplus funds, property and all other assets of Mutual, whether real, personal, or mixed, tangible or intangible, of whatsoever kind or character and wherever located; all of Mutual's books, papers, documents, and records having to do with the business transferred or with any other business affairs of Mutual, including contracts, leases, and records of whatsoever nature. However, under paragraph 2(d) of the merger agreement, Mutual was to retain assets which were valued at $250,000 on the books of Mutual to pay off the principal amount of the guaranty fund certificates and sufficient assets to pay interest on such certificates. Under paragraph 3 of the merger agreement, Merit was to assume all liabilities of Mutual, including liabilities arising under all of Mutual's outstanding policies in force on the effective date of the agreement.

As of December 31, 1968, all of the consents necessary for the merger agreement were obtained, and all of the required conditions with respect thereto were satisfied; accordingly, on that date, the director of insurance for the State of Illinois issued a certificate of merger approving the merger agreement. Mutual was thereby merged into Merit, with Merit surviving. After the merger, Merit continued to operate the insurance business theretofore carried on by Mutual at the same location, using the same facilities and employing the same personnel.

Between the date of the reinsurance agreement and the merger, Mutual continued to issue policies in New York. As a result of the merger, Merit assumed the liability under such policies; the unearned premiums, less a ceding commission of 20 percent, were transferred to Merit.

On Mutual's 1968 Federal income tax return, it included in its income the ceding commission paid pursuant to the reinsurance agreement and the ceding commission paid pursuant to the merger agreement. On its 1968 income tax return, Merit

deducted both the ceding commissions. On its returns for 1968, 1969, and 1970, Merit reported losses, and its shareholders, the petitioners herein, claimed their distributive shares of those losses on their individual returns.

In his notice of deficiency, the Commissioner made a number of adjustments in the losses claimed by the petitioners, including a disallowance of such losses to the extent that they were attributable to the deduction of the ceding commission paid pursuant to the reinsurance agreement. All adjustments have been settled or conceded, except for that based on the disallowance of such deduction.

## OPINION

Merit is a stock casualty insurance company subject to the tax imposed by section 831(a)(1). Section 832(c)(1) provides that such an insurance company shall be allowed a deduction for all ordinary and necessary business expenses as provided in section 162. Ordinarily, a ceding commission is considered to be such an expense. In *Colonial Surety Co. v. United States,* 178 F. Supp. 600, 602 (Ct. Cl. 1959), the court explained:

It is common knowledge that any insurance company pays its agents commissions for writing insurance. Plaintiff had written the insurance which it re-insured with North America. It did not write it as the agent of North America, but when it reinsured the business with North America, it was recognized that it was entitled to the usual agent's commission. Every agent of North America who wrote insurance for it received a commission for doing so. When plaintiff reinsured the business with North America it took on, as between it and North America, the character of agent, and as such it was entitled to a commission on the amount reinsured with North America. * * *

In support of his action, the Commissioner argues that the reinsurance transaction was merely a step in executing the preconceived plan to transfer the insurance business from Mutual to Merit. He asserts that once Merit was established, Mutual had to be terminated shortly; that Mutual's insurance business had to be transferred to Merit; and that there was no substantial business reason for entering into the separate reinsurance agreement. Consequently, he argues that all these steps were part of an integrated plan; that the step-transaction doctrine should be applied; and that, in essence, the ceding commission constituted nothing more than part of the payment for the

acquisition of intangible assets consisting of the insurance business.

We agree that the reinsurance of Mutual's policies was merely a step in the transfer of its business to Merit and that the step-transaction doctrine is applicable in this case. Thus, the tax consequences of the reinsurance arrangement must be determined as if there had been no separate reinsurance agreement in advance of the merger, but as if the reinsurance arrangement had been set forth as a part of the merger agreement. Yet, even when we view the arrangement in that manner, it is our conclusion that the ceding commission is deductible.

It is well established that when a business is sold, it is not treated for tax purposes as the sale of a single asset; instead, the sale is treated as involving a "mixed bag of assets," which must be sorted to determine the taxable nature of each asset. *Watson v. Commissioner,* 345 U.S. 544, 551-552 (1953); *Williams v. McGowan,* 152 F. 2d 570, 572-573 (2d Cir. 1945); *Charles W. Miller,* 56 T.C. 636, 649, 651 (1971); see *C. D. Johnson Lumber Corp.,* 12 T.C. 348, 363 (1949); Note, "Considerations in Applying the Rule of Williams Versus McGowan," 13 Tax L. Rev. 369 (1958). From the seller's point of view, some of the items sold may result in capital gain, while other items may produce ordinary income. Conversely, some of the purchaser's expenditures may be capital in nature, while others may be currently deductible. *Williams v. McGowan, supra; Charles W. Miller, supra* at 649, 651; *United States Mineral Products Co.,* 52 T.C. 177, 193 (1969); Note, *supra.* If the parties have specified a reasonable consideration for an item, it will be given effect even though the parties are not strangers. *Charles W. Miller, supra* at 647-648; *United States Mineral Products Co., supra* at 192; see *F & D Rentals, Inc.,* 44 T.C. 335, 345 (1965), affd. 365 F. 2d 34 (7th Cir. 1966). Accordingly, if a purchaser pays for an item which represents a currently deductible business expense, and if the allocation agreed to by the parties for such an item is reasonable, it will be deductible by the purchaser even though it is paid in connection with the purchase of a business.

In *Buckeye Union Casualty Co.,* 54 T.C. 13 (1970), affd. 448 F. 2d 228 (6th Cir. 1971), this Court recognized that the tax treatment of a ceding commission is to be determined separately even though it was paid in connection with the sale of an entire

insurance business. Therein, the petitioners adopted plans of complete liquidation and, within 12 months thereafter, transferred their casualty insurance businesses to another corporation in accordance with two separate agreements. Under one agreement (the reinsurance agreement), the transferee assumed all liabilities under outstanding policies issued by the petitioners, and the petitioners transferred the unearned premiums with respect to such policies but retained 35 percent thereof as a ceding commission. Under the other agreement (the supplemental agreement), the petitioners transferred all other assets, both tangible and intangible, for a stated consideration. The petitioners took the position that the entire transaction constituted a sale within the meaning of section 337 and that, therefore, they were not taxable on the ceding commission which they retained under the reinsurance agreement or on the consideration which they received under the supplemental agreement. The Commissioner agreed that the consideration received for the sale of the tangible and intangible assets was not taxable, but he contended that the ceding commission did not result from a sale and was not exempt from taxation by section 337. The Court found that the ceding commission did not constitute the proceeds of a sale and was taxable.

Although the precise issue in *Buckeye* was different, the rationale of the Court's holding is applicable to this case. Even though there was a sale of the entire business, the Court found that the arrangement for the reinsurance of the outstanding insurance policies was a separate transaction. For that reason, the commission received in connection with the reinsurance arrangement was held not to constitute a part of the proceeds of the sale of the business. That rationale undercuts the position maintained by the Commissioner in this case and supports the petitioners' claim herein.

In this case, we have a merger and not a sale at arm's length between strangers, but on this record, there is no reason to treat the merger differently. Mutual and Merit were distinct legal persons. In connection with the transfer of the business from one to the other, an arrangement had to be made to reinsure the outstanding liabilities of Mutual, and provision was made for the payment of a ceding commission for such reinsurance. The payment of such commission was in accordance with standard insurance practice and was required by the State regulatory

authority as a condition for the approval of the transfer of the business. For our purposes, it is immaterial whether the reinsurance agreement was actually signed by the director of insurance. Moreover, there is no suggestion that the 20 percent paid by Merit as a ceding commission was excessive and constituted more than a bona fide ceding commission. In the light of these facts, we find that the payment by Merit of the ceding commission was an ordinary and necessary expense of its business and hold that such payment is deductible.

In view of that holding, we need not consider certain alternative arguments presented by the petitioners.

Decisions will be entered under Rule 155.