W. F. GLISSON and FRANCES M. GLISSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Glisson v. Commissioner
Docket No. 7556-77.
United States Tax Court
T.C. Memo 1981-379; 1981 Tax Ct. Memo LEXIS 365; 42 T.C.M. (CCH) 470; T.C.M. (RIA) 81379; July 27, 1981
*365 In 1974, petitioner W. F. Glisson sold a business which he had operated as a sole proprietorship. The sale included assets that he had used in another business which he discontinued in 1961. Held, no part of the sale price of those assets is allocable to goodwill. Held further, petitioners were entitled to report any gain from the sale of those assets under sec. 453(b), I.R.C. 1954. William Eckhardt, for the petitioners. Lewis J. Hubbard, Jr., for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined a $ 59,983.74 deficiency in petitioners' Federal income tax for the taxable year ended June 30, 1974. After concessions, the issues for decision are: 1. Whether any portion of the sale price of certain assets must be allocated to goodwill. 2. Whether petitioners may report any gain from the sale of those assets under section 453(b); [1] and if not, whether petitioners must determine the gain from such sale on the basis of the face value of the promissory note received in exchange for those assets. FINDINGS OF FACT Some of *366 the facts have been stipulated and are found accordingly. W. F. Glisson (hereinafter petitioner) and Frances M. Glisson, husband and wife, resided in Albany, Georgia, when they filed their joint Federal income tax return for the taxable year ended June 30, 1974, with the Internal Revenue Service Center, Chamblee, Georgia, and when they filed their petition in this case. In 1945, petitioner began a business entailing the sale of automobile parts. In 1946, petitioner entered the industrial parts business, which included the sale of belts, chains, pulleys, shafts, couplings, and other such parts for industrial machinery and equipment. Petitioner developed his own brand of belts, under the registered name of Nytro, which were manufactured in bulk lots for him. Petitioner also purchased various other parts in bulk and his stock of industrial parts accumulated over the course of time. In 1961, petitioner entered the agricultural parts business, selling parts to farm implement dealers. Upon entering the agricultural parts business, petitioner ceased calling on his industrial parts customers and discontinued his industrial parts business. Since petitioner had terminated his industrial *367 parts business, he was unable to dispose of his stock of industrial parts. Although petitioner attempted to return such stock to the manufacturers, they would not provide cash refunds for the returned parts, but were only willing to give him credits to purchase more of the same merchandise. While petitioner considered disposing of the industrial parts for salvage, he discovered that the cost of shipping and handling would exceed the proceeds from such a sale and simply decided to leave his stock of industrial parts on the "shelf." Prior to 1974, petitioner neither attempted to sell nor did he actually sell any of the industrial parts he had on hand when he began his agricultural parts business. Petitioner operated the aforementioned business ventures as a sole proprietorship, using the name W.F. Glisson Company (hereinafter sometimes referred to as "the company"). The company's principal place of business was in Albany, Georgia. With respect to the operation of the company, petitioner maintained inventories and used the accrual method of accounting. Petitioner and his wife, however, used the cash method of accounting to compute their items of income and deductions that were not *368 connected with the company. In the early 1970's, petitioner and Southern Belting & Transmission Company (hereinafter Southern Belting) initiated negotiations regarding the sale of the company to Southern Belting. On numerous occasions, petitioner discussed the possibility of such a sale with the president of Southern Belting, Lee N. Lindeman (hereinafter Lindeman). The assets that would be included in the sale of the company to Southern Belting was a matter determined pursuant to the negotiations between the parties. While Southern Belting would purchase some of the assets petitioner used in the operation of his business immediately prior to the sale, the sale also would include assets that petitioner had not used in connection with his business in recent years, namely the industrial parts. On October 30, 1973, Lindeman sent petitioner a letter that set forth Southern Belting's intention to acquire his business. The letter provided, in part, as follows: Based on numerous discussions we have had with respect to Southern Belting & Transmission Co. purchasing W.F. Glisson Co., we feel we are in a position now to state our intention to acquire W.F. Glisson Co., subject to the mutually *369 agreeable determination of the following. This is not a binding contract and cannot become so until put in contract form and approved by our Board of Directors. We intend to proceed with determining the selling price in the following manner. Southern Belting & Transmission Co. will purchase the assets of the W.F. Glisson Co. as determined by extension at the lower of cost or market of the physical inventory count of items which we have agreed to purchase (the final determination of that to be made as soon as possible following the physical count); the Accounts Receivable which we determined to be collectible by audit test; and other miscellaneous assets which will have to be specified in a final Sales Contract. The value of these assets will be reduced by outstanding liabilities such as Trade Payables and other obligations which must be deducted in order to arrive at a Net Worth of the W.F. Glisson Co. A minimum formula that can be used to determine the value of the going concern, the W.F. Glisson Co., is to multiply the anticipated Net Profit after taxes that should be realized by Southern Belting & Transmission Co., after providing for a reasonable management fee and miscellaneous *370 extra operating expenses not currently incurred by W.F. Glisson Co., by a multiple of four. However, it is anticipated that the Net Worth of W.F. Glisson Co. will exceed the product of this formula. Therefore, it will be necessary to wait for an independent audit of W.F. Glisson Co. to be made by Peat, Marwick, Mitchell & Co. in order to determine the final selling price. Southern Belting & Transmission Co. intends to pay to Mr. W. F. Glisson the final selling price as determined above, in ten equal installments to be paid annually at a mutually agreed upon date, interest to be paid on the unpaid balance at the rate of six (6) percent per annum. On March 1, 1974, a physical inventory and accounting of all of the assets and liabilities encompassed by the sale was taken under the supervision of Southern Belting's accountants, Peak, Marwick, Mitchell & Co. (hereinafter Peat-Marwick). Subsequently, Peat-Marwick conducted certain auditing procedures with respect to this accounting and valued such assets as of April 1, 1974. For purposes of this accounting and audit, petitioner's parts merchandise was divided into the following three groups: the "group I inventory" which consisted almost *371 entirely of power transmission items and included petitioner's stock of industrial parts; the "group II inventory" which was characterized by articles generally referred to as mill supply items; and the "group III inventory" which was composed primarily of auto parts. Southern Belting was only interested in acquiring the group I inventory, and in particular petitioner's stock of industrial parts, because it was a distributor of such items. Nevertheless, it was willing to purchase the group II inventory at later date at a negotiated price if petitioner could not sell such property. By means of the accounting and audit, the sale price of the assets that Southern Belting would purchase was determined in the manner set forth in the letter of intent Lindeman sent to petitioner. Accordingly, a price of $ 105,330.51 was assigned to the industrial parts included in the group I inventory. On April 1, 1974, petitioner, as "seller, " and Southern Belting as "buyer," entered into a contract for the sale of petitioner's business (hereinafter sales contract) which provided, in part, as follows: 1. Sale of Business. The Seller shall sell and the Buyer shall purchase, subject to all liabilities *372 and encumbrances to be listed on Exhibit "D" at time of closing, the business now being conducted by the Seller known as W.F. GLISSON CO., including the stock-in-trade, accounts receivable, furniture, fixtures and equipment, transferable insurance policies, and all contracts, licenses and deposits thereunder which have been made by or granted to the Seller in connection with the business, and all other property (including cash) owned and used by the Seller in the business, all as more specifically enumerated in the attached schedule of assets to be sold by the Seller, marked Exhibit "A" and made a part hereof, with right to use the trade name of Seller, W.F. Glisson Co. 2. Purchase Price. The purchase price for all the assets referred to in paragraph 1 shall be the value thereof as determined in accordance with the provisions of paragraph 3. The total purchase price shall be adjusted, at the time of the closing, for the following items: All liabilities and encumbrances set forth in Exhibit "D" and any insurance premiums, utilities (other than deposits) and payroll and payroll taxes. The net amount of these adjustments shall be an increase or decrease of the purchase price, as the *373 case may be. No adjustment shall be made for any license fees paid by the Seller. 3. Valuation of Assets. The value of the assets being sold shall be determined on April 1, 1974. On March 1, 1974, a physical inventory and accounting of all the assets of the business was taken, and such inventory shall be maintained during the month of March, 1974, and the accounting firm of Peat, Marwick, Mitchell & Co. shall audit and value same as of April 1, 1974. Accounts receivable are to be aged and valued according to generally accepted accounting principles and other assets are to be valued at cost or market value, whichever is the lower. Copies of the completed inventory shall be delivered to the Buyer and the Seller. If the closing is delayed beyond April 1, 1974, all operations of the business after April 1, 1974, shall be for the account and benefit of the Buyer. Attached to the sales contract were the schedules referred to as "Exhibits A and D" which provided that the following assets would be sold and liabilities assumed: ASSETS
Cash in Company Bank account in the
C & S Bank of Albany
$ 7,261.11
Cash on hand at Company office,
334 Broad
253.79
Trade accounts receivable
27,051.48
O.E.M. Rebates receivable
178.64
Merchandise returned for which
credit has not been received
[2] *374 1,886.64
The following physical property located
at 334 W. Broad in the Glisson Building: Inventory [3]
129,961.51
Shelving
5,452.12
Office equipment
3,000.00
Office and paper supplies
2,000.00
LIABILITIES
Atlas Chain
$ 13.35
Eaton, Yale and Towne
171.69
Martin Sprocket
68.58
Payroll and withholding tax
527.48
The total purchase price under the sales contract was $ 176,264.48, payable pursuant to a negotiable promissory note which petitioner received from Southern Belting. The promissory note was unsecured and provided that Southern Belting would pay petitioner the principal sum of $ 176,264.48 in ten equal installments with interest on the unpaid balance from April 1, 1974, at a rate of six percent per annum. The first installment was due on July 1, 1974, with the remaining nine installments payable on the first day of July of each year thereafter. Under the sales contract, Southern Belting purchased the group I inventory and promised to purchase the group II inventory that petitioner was unable to sell by April 1, 1975. Southern Belting agreed to pay petitioner the lower of cost or market value for such group *375 II inventory, but would not be required to purchase merchandise with a total value in excess of $ 20,000. In both 1975 and 1976, petitioner and Southern Belting agreed to a one-year extension of time for petitioner to sell the group II inventory. At the time of the trial of the instant case, Southern Belting had not purchased any of the group II inventory. Pursuant to the sales contract, petitioner also agreed to enter into a consulting agreement with Southern Belting whereby he would convenant not to engage, directly or indirectly, in a competitive business within a 100-mile radius of Albany, Georgia, for a period of three years. In exchange for his agreement to serve as a consultant and not to compete, petitioner would be paid $ 5,000 per year for the three-year duration of such agreement. In pertinent part, the agreement provided: 1. Glisson covenants and agrees as follows: (a) Glisson shall not establish, engage in, or in any manner become interested in, directly or indirectly, as an employee, owner, partner, agent, shareholder or otherwise, any business, trade or occupation the same as or similar to the business now being conducted by Glisson as the W.F. GLISSON COMPANY (hereinafter *376 called the "Business") within a radius of 100 miles of the City of Albany, Georgia, for a period of three (3) years from the date hereof; (b) Glisson shall not, directly or indirectly, request or advise any present or future customer of the Business to withdraw, curtail or cancel his business with the Business; (c) Glisson shall not, directly or indirectly, disclose to any other person, firm or corporation the names of past, present or future customers of the Business; (d) Glisson shall not, directly or indirectly, induce, or attempt to influence any employee of the business to terminate his employment. 2. Glisson agrees to consult with Southern Belting with respect to the operation of said Business at such times as Glisson shall deem necessary in Glisson's sole discretion. Finally, the sales contract provided that petitioner would lease to Southern Belting the premises from which he had conducted his business. The lease was executed on April 1, 1974, and provided for a lease term of five years at a monthly rental of $ 450, but allowed Southern Belting to terminate the lease upon six months notice to petitioner. Southern Belting operated the business out of the leased premises *377 until late 1976, when it terminated the lease and moved into a new building it had constructed in Albany, Georgia. Prior to its acquisition of petitioner's business, Southern Belting had supplied parts to industrial customers, but had not dealt with farm implement dealers or other agricultural customers. In addition to purchasing various assets, Southern Belting also hoped to acquire petitioner's agricultural customers when it purchased his business. Consequently, during the year following the acquisition, pursuant to the consulting agreement, petitioner spent a significant amount of time introducing Southern Belting's employees to his customers. In addition, Southern Belting has used petitioner's name in conducting its Albany, Georgia, operation. Southern Belting purchased petitioner's stock of industrial parts because it considered such merchandise to be readily saleable to its regular customers. Since the purchase, Southern Belting has written-off only an insignificant portion of the industrial parts it acquired from petitioner. On the joint return filed for their taxable year ended June 30, 1974, petitioner and his wife elected to report the income from the sale to Southern *378 Belting under the installment method pursuant to section 453(b). Since they had not received any payments under the sales contract prior to July 1, 1974, they reported no gain from the sale on their return. In the notice of deficiency, respondent determined that petitioner was not entitled to report the income from the sale of his industrial parts under the installment method because the parts constituted inventory. Accordingly, respondent determined that petitioner and his wife had additional ordinary income of $ 105,330.51 for the taxable year ended June 30, 1974. [4]
OPINION We must first decide whether any portion of the sale price allocable to petitioner's stock of industrial parts must be allocated to goodwill. It is well settled that the sale of a business is treated for tax purposes as a separate sale of each of the assets comprising the business. Watson v. Commissioner, 345 U.S. 544, 551-552 (1953). *379 Williams v. McGowan, 152 F. 2d 570, 572-573 (2d Cir. 1945); Stern v. Commissioner, 66 T.C. 91, 99 (1976). Moreover, this Court has explicitly held that for the purposes of section 453 the sale of a going business operated as a sole proprietorship should be fragmented into the sales of the separate assets of the proprietorship. Monaghan v. Commissioner, 40 T.C. 680, 687 (1963). See also Farha v. Commissioner, 58 T.C. 526, 536-537 (1972), affd. 483 F. 2d 18 (10th Cir. 1973). Consequently, since goodwill is a capital asset and not inventoriable merchandise, any gain realized from sale thereof would be taxable as capital gain and could be reported under the installment method. Petitioner argues that some portion of the sale price allocable to his stock of industrial parts under the sales contract should have been allocated to goodwill. [5] On the other hand, respondent maintains that petitioner has not established that the allocation made under the sales contract to the group I inventory and the industrial parts included therein was improper. Accordingly, he concludes that petitioner is bound by that allocation. For the reasons discussed below, we agree with and hold for respondent on *380 this issue. Generally, this Court has held that when a taxpayer who is a party to an agreement seeks to alter an allocation set forth therein, he must establish by "strong proof" -- beyond a mere preponderance of the evidence -- that the proffered allocation reflects the actual intention of the parties and that such an allocation comports with economic reality. Major v. Commissioner, 76 T.C. 239 (1981); G C Services Corporation v. Commissioner, 73 T.C. 406, 412 (1979); Lazisky v. Commissioner, 72 T.C. 495, 501-502 (1979), affd. 636 F. 2d 11 (1st Cir. 1981). On prior occasions, the Fifth Circuit, to which an appeal would lie in this case, has accepted and applied the strong proof rule with respect to cases involving contractual allocations to covenants not to compete. Sonnleitner v. Commissioner, 598 F. 2d 464 (5th Cir. 1979), affg. a Memorandum Opinion of this Court; Dixie Finance Company v. United States, 474 F. 2d 501 (5th Cir. 1973), affg. Memorandum Opinions of this Court; Balthrope v. Commissioner, 356 F. 2d 28 (5th Cir. 1966), *381 affg. a Memorandum Opinion of this Court; Barran v. Commissioner, 334 F. 2d 58 (5th Cir. 1964), affg. on this issue 39 T.C. 515 (1962). Recently, however, the Fifth Circuit, in Spector v. Commissioner, 641 F. 2d 376 (5th Cir. 1981), revg. 71 T.C. 1017 (1979), for the first time considered the stricter rule enunciated in Commissioner v. Danielson, 378 F. 2d 771 (3d Cir. 1967), cert. denied 389 U.S. 858 (1967), revg. 44 T.C. 549 (1965), and indicated that it would apply the "Danielson rule" to cases such as the one at bar. [6] *382 The Danielson rule provides as follows: a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc. Commissioner v. Danielson, supra at 775. In the instant case, however, we need not concern ourselves with which one of the aforementioned rules is applicable because under either rule petitioner has failed to satisfy his burden of proof. No evidence was produced to show that *383 the allocation made under the sales contract to the group I inventory and the stock of industrial parts included therein was not bargained for or was economically unrealistic. To the contrary, the letter of intent sent by Lindeman to petitioner when considered together with their prior discussions indicates that as a result of the bargaining process they agreed to determine the sale price of these assets on the basis of the lower of the cost or market value thereof. Furthermore, there is no indication that there was anything amiss with respect to the actual determination of the sale price under this formula. Although petitioner maintains that some portion of the sale price assigned to his stock of industrial parts must be allocable to goodwill because those assets had little value to him, this argument is seriously flawed. While the industrial parts may have had little value to petitioner, that was due to the fact that he had abandoned his industrial customers long ago. On the other hand, Southern Belting was a distributor of such merchandise and undoubtedly had a ready market therefor. Consequently, the industrial parts certainly were valuable to Southern Belting. While petitioner *384 has asserted that some portion of the sale price should have been allocated to goodwill, he has not proposed any specific amount that should have been allocated thereto, nor has he advanced any recommendations as to how that amount should be determined. Furthermore, there is no evidence in the record which even suggests that the parties discussed an allocation of some portion of the sale price to goodwill. Neither the sales contract nor the consulting agreement mentioned goodwill, and we are convinced that the parties never intended to make an allocation to goodwill. Cf. G C Services Corp. v. Commissioner, supra.
Although Southern Belting contemplated the acquisition of petitioner's agricultural customers when it purchased his business, it planned to attain this goal through the consulting agreement and the covenant not to compete included therein. In fact, pursuant to the consulting agreement, petitioner spent a substantial amount of time introducing Southern Belting's employees to his customers during the year following the sale. By means of these services and the covenant not to compete, Southern Belting sought to acquire petitioner's customers. Petitioner, however, has not even *385 suggested that some portion of the payments made pursuant to the consulting agreement are allocable to goodwill. Finally, petitioner has adduced no proof indicating that the sales contract or the allocations made thereunder were forced upon him by mistake, undue influence, fraud, or duress. On the basis of the record herein, we hold that petitioner has failed to prove by even a preponderance of the evidence that some portion of the sale price of his stock of industrial parts is allocable to goodwill. Accordingly, petitioner is bound by the allocation made under the sales contract. We next consider whether petitioner may report the gain from the sale of his stock of industrial parts under section 453(b). Pursuant to section 453, [7] *387 the income from "a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year)" may be reported under the installment method. It is respondent's position that petitioner's stock of industrial parts was property of a kind which would have properly been included in his inventory if on hand at the close of the taxable *386 year, and therefore, he was not entitled to report any income from the sale thereof under the installment method. Petitioner, on the other hand, argues that at the time of the sale to Southern Belting his stock of industrial parts was not property of a kind which would properly be included in his inventory if on hand at the close of the taxable year. According to petitioner, he discontinued his industrial parts business in 1961 when he began selling agricultural parts. Thereafter, he no longer held his stock of industrial parts for sale to customers in the ordinary course of his business and such parts did not constitute inventory. Accordingly, petitioner maintains that he is entitled to report any income from the *388 sale of his industrial parts under the installment method. We agree. Essentially, a taxpayer's inventory encompasses goods held for sale in the ordinary course of his business. Section 1.471-1, Income Tax Regs., provides that "inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor." Assets which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year are not considered to be held for investment purposes and are excluded from the definition of capital assets under section 1221(1). Thus, any gain realized from the sale of inventory is taxable as ordinary income. The provision that specifically excludes a sale of inventory from the meaning of "a casual sale or other casual disposition of personal property" for purposes of section 453 first appeared in the Revenue Act of 1928. Sec. 44, Revenue Act of 1928, ch. 852, 45 Stat. 805. In commenting on this provision, Congress indicated that it was added to erase any doubt as to the fact that a sale of inventory should not be regarded as a casual sale of personal property. *389 H. Rept. No. 2, 70th Cong., 1st Sess. 15 (1927); S. Rept. No. 960, 70th Cong., 1st Sess. 23 (1928). Clearly, since a sale of inventory represents a sale in the ordinary course of a taxpayer's business, it should not be considered a casual sale. See G.C.M. 1162, VI-1 C.B. 22. In circumstances similar to those in the instant case, this Court has recognized that the characterization of any particular asset for tax purposes is a question of fact which turns upon the taxpayer's purpose for holding such property. Maddux Construction Company v. Commissioner, 54 T.C. 1278, 1286 (1970); Eline Realty Company v. Commissioner, 35 T.C. 1 (1960); Edwards v. Commissioner, 32 T.C. 751, 757 (1959); Carl Marks & Co. v. Commissioner, 12 T.C. 1196, 1202 (1949). Since intent is subject to change, the crucial factor is the purpose for which the property is held during the period in question. Eline Realty Company v. Commissioner, supra at 5; Carl Marks & Co. v. Commissioner, supra at 1202. Although petitioner originally purchased the industrial parts for sale to customers in the ordinary course of his business and such property would have properly been considered inventory, his intent with respect to *390 those assets changed. We have found as facts that in 1961 petitioner abandoned his industrial parts customers and discontinued his industrial parts business. From that time until 1974, petitioner neither attempted to sell nor did he actually sell any of his stock of industrial parts. After 1961, petitioner was no longer engaged in any business activities in connection with his stock of industrial parts, and we do not consider those parts includable in the inventory of petitioner's agricultural parts business.When Southern Belting purchased petitioner's business, the industrial parts were included in the sale because Southern Belting so desired. Since the sale of the industrial parts to Southern Belting was the only sale of such merchandise made by petitioner in over a decade, it was truly a casual sale. On the basis of the facts and circumstances herein, we are convinced that petitioner's industrial parts were not held for sale to customers in the ordinary course of his business and did not constitute inventory but rather capital assets at the time of the sale to Southern Belting. See Carl Marks & Co. v. Commissioner, supra.See also Baker v. Commissioner, 248 F. 2d 893 (5th Cir. 1957), *391 affg. a Memorandum Opinion of this Court; Greenspon v. Commissioner, 229 F. 2d 947 (8th Cir. 1956), revg. on this issue 23 T.C. 138 (1954). It is clear that the mere intent to discontinue business or liquidate does not convert stock in trade into a capital asset. Grace Bros., Inc. v. Commissioner, 10 T.C. 158, 164 (1948), affd. 173 F. 2d 170 (9th Cir. 1949); Martin v. United States, 330 F. Supp. 681, 683-684 (M.D. Ga. 1971). Rather, as we stated above it is the taxpayer's purpose for holding the property which is the determinative factor. See Shumaker v. Commissioner,     F. 2d     (9th Cir., June 22, 1981, 81-2 USTC par. 9508), affg. in part and revg. in part a Memorandum Opinion of this Court. In the instant case, we believe that petitioner's purpose for holding the industrial parts was more akin to an investment purpose at the time of the sale to Southern Belting. After he ceased selling such merchandise, for lack of a more attractive alternative petitioner kept the industrial parts in the hope of someday recouping a portion of the cost thereof and he so held the parts until the sale to Southern Belting.
In our view the mere fact that property was at one time includable in *392 the inventory of a taxpayer does not forever after taint such property with respect to that taxpayer for purposes of section 453(b), when, in fact, the taxpayer has changed his purpose for holding such property. Accordingly, we hold that at the time of the sale to Southern Belting petitioner's stock of industrial parts was not property of a kind which would properly be included in his inventory if on hand at the close of the taxable year, and therefore, he was entitled to report any gain from the sale thereof under the installment method. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue.↩
2. This figure should be $ 1,886.93. The error was due to a typographical error by the parties. 3. The assets labelled inventory represented only the group I inventory, and $ 105,330.51 of the sale price of that merchandise was allocable to petitioner's stock of industrial parts.↩
4. Apparently, respondent determined that petitioner had written-off his stock of industrial parts in prior years, thereby obtaining a reduction in his gross income from sales of inventory during those years. Consequently, he determined that the entire proceeds from the sale of those parts constituted taxable income.↩
5. No brief has been filed on petitioner's behalf. Consequently, his arguments have been gleaned from his petition and his counsel's opening statement at trial.↩
6. In Spector v. Commissioner, 641 F. 2d 376 (5th Cir. 1981), revg. 71 T.C. 1017 (1979), the taxpayer sought to avoid the tax consequences of a transaction as bargained for and agreed to by himself and the other parties thereto on the ground that it did not comport with economic reality. Although the written agreement provided for guaranteed payments to the taxpayer in liquidation of his purported interest in a partnership under sec. 736(a)(2), the taxpayer argued that he actually received the payments for the sale of his interest in another partnership under sec. 741, thereby creating long-term capital gain rather than ordinary income. While this Court applied the strong proof rule in holding for the taxpayer, the Fifth Circuit determined that we had applied an incorrect test in determining whether the taxpayer should be allowed to challenge the form of the transaction and held that the "Danielson↩ rule" should have been applied. Although the Fifth Circuit did not decide whether it would apply the same approach to future cases involving contractual allocations to covenants not to compete, the Court did state "that the Danielson rule is not inconsistent with the principles heretofore espoused by this Court in that area."
7. Section 453 provided, in part, as follows: SEC. 453. INSTALLMENT METHOD. (a) Dealers in Personal Property.-- (1) In general.--Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price. (2) Total contract price.--For purposes of paragraph (1), the total contract price of all sales of personal property on the installment plan includes the amount of carrying charges or interest which is determined with respect to such sales and is added on the books of account of the seller to the established cash selling price of such property. This paragraph shall not apply with respect to sales of personal property under a revolving credit type plan or with respect to sales or other dispositions of property the income from which is, under subsection (b), returned on the basis and in the manner prescribed in paragraph (1). (b) Sales of Realty and Casual Sales of Personalty.-- (1) General rule.--Income from-- (A) a sale or other disposition of real property, or (B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $ 1,000, may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a).↩